THE HON. WILLIAM L. HOLLOWAY,  
THE HON. SYDNEY SANNER,  } Associate Justices.

---

NORTHERN PACIFIC RY. CO., APPELLANT, v. MJELDE,  
COUNTY TREASURER, RESPONDENT.

(No. 3,399.)

(Submitted November 17, 1913. Decided December 6, 1913.)

[137 Pac. 386.]

*Taxation—Estates in Land—Deeds—Reservations—Mines—Mining Claims—Exemptions—Burden of Proof—Constitution—Construction.*

Taxation—Estates in Land—Deeds—Reservation of Metals.

1. *Held,* that the estate remaining in the Northern Pacific Railway Company by reason of clauses inserted in deeds to portions of the lands granted to it by the government, which reserve "unto the grantor, its successors and assigns, forever, all mineral * * * including coal," as well as the use of the surface ground for exploration purposes, is an interest in real estate and therefore subject to taxation; *held,* further, that such interest does not constitute either a "mine" or a "mining claim" within the meaning of section 3, Article XII, of the state Constitution, proving, *inter alia,* that, independently of the surface ground, only the net proceeds of this species of property shall be taxable.

[As to the exemption from taxation of land owned by governmental bodies or in which they have an interest, see note in 132 Am. St. Rep. 291.]

Constitution—Nature of Instrument.

2. The state Constitution is a limitation upon legislative action, and not a grant of power.

Taxation—Revenue—Constitution—Construction.

3. Since the subject dealt with in section 3, Article XII of the Constitution, was revenue, any doubt as to the sense in which any term

(287),

therein found was used by the framers of that instrument must be resolved in favor of a definition under which public revenue will be raised, rather than one which will defeat such purpose.

Constitution—Legislative Construction—Effect.

    4. A construction for many years placed upon a constitutional provision by the legislature in enacting statutes is entitled to respectful consideration by courts.

Same—Taxation—Mines and Mining Claims—Definition.

    5. A "mining claim," as used in section 3, Article XII of the Constitution, relating to revenue, *held* to be a tract of land to which the right of possession or the title has been acquired pursuant to the Acts of Congress relating to the disposition of mineral lands, including coal lands; and a "mine," independently of the surface, *held* to be a developed mining property yielding, or in a condition capable of yielding, revenue.

Taxation—Estates in Land.

    6. The separate estates which different persons may own in the same land—as where one owns the surface, another the growing timber, and a third the mineral underground—may each be subject to taxation.

Same—Exemptions—Burden of Proof.

    7. Taxation being the rule and exemption the exception, the burden is upon him who claims that his property is exempt, to allege and prove facts bringing it within the favored class.

Same—Estates in Land—Cash Value—Difficulty in Ascertaining not Criterion.

    8. Difficulty which may confront the assessor in ascertaining the full cash value of an interest in real estate reserved by the grantor in himself in a deed conveying the land may not be taken into account in determining whether such interest is subject to taxation.

*Appeal from District Court, Park County; Albert P. Stark, Judge.*

ACTION by the Northern Pacific Railway Company against Fred J. Mjelde, Treasurer of Park County. From a judgment for defendant, plaintiff appeals. Affirmed.

*Messrs. Gunn & Rasch* and *Mr. O. M. Harvey,* for Appellant, submitted a brief and one in reply to that of Respondent. *Mr. M. S. Gunn* argued the cause orally.

    The question for decision is whether the coal, which is the property of the plaintiff by virtue of the exception or reservation contained in the deed, is subject to taxation. We maintain that this question should be answered in the negative, by reason of the provisions of section 3 of Article XII of the Constitution of Montana. In the lower court it was contended in support of the demurrer that the words, "All mines and

mining claims," in the above section of the Constitution, have reference only to land acquired from the United States pursuant to the Act of Congress relating to the disposition of mineral land, and the Act of Congress relating to the disposition of coal land, and that, as the title to the land in question was acquired from the United States by grant to the Northern Pacific Railroad Company, such land is not within the provisions of the section above. Is this contention correct? If not, it necessarily follows that the coal in the land which was reserved and remains the property of the plaintiff is not subject to taxation.

This court decided in the case of *Montana Coal & Coke Co.* v. *Livingston,* 21 Mont. 59, 52 Pac. 780, that the section of the Constitution referred to applies to the annual net proceeds of coal mines and mining claims acquired under the laws of the United States, relating to the acquisition of coal lands. Section 3 refers to "All mines and mineral claims  *   *   *   containing  *   *   *  coal or other valuable mineral deposits," *etc.* In view of this language, and of the decision of this court in the *Montana Coal & Coke Company Case,* it must be conceded that the reservation in question would not be taxable, provided the land had been acquired pursuant to the laws of the United States relating to acquisition of title to coal lands. According to the contention made in support of the demurrer, the asserted right to tax the reservation in question is founded on the fact that the land containing coal was not acquired from the United States pursuant to the Acts of Congress relating to coal lands and mineral lands, but by the grant to the Northern Pacific Railroad Company in the Act of Congress of July 2, 1864. If section 3 is subject to such a construction, then the section requires a classification to be made with reference to the law pursuant to which title is acquired from the United States and without regard to the nature of the property. Such a construction of the section renders it obnoxious to the provision of the Fourteenth Amendment to the Constitution of the United States, prohibiting any state from "denying to any person within its jurisdiction the equal protection of the laws." This

prohibition prevents the exemption of property from taxation, unless all of the class to which such property belongs is within the exemption. (*Gulf, C. & S. F. R. Co.* v. *Ellis,* 165 U. S. 150, 41 L. Ed. 666, 17 Sup. Ct. Rep. 255; 1 Cooley on Taxation, 3d ed., 72 *et seq.; Southern R. Co.* v. *Greene,* 216 U. S. 400, 17 Ann. Cas. 1247, 54 L. Ed. 536, 30 Sup. Ct. Rep. 287; *Connolly* v. *Union Sewer Pipe Co.,* 184 U. S. 540, 46 L. Ed. 679, 22 Sup. Ct. Rep. 431; *Cunningham* v. *Northwestern Imp. Co.,* 44 Mont. 180, 119 Pac. 554; *Essex County Park Commission* v. *Town of Orange,* 77 N. J. L. 575, 73 Atl. 511; *State* v. *Cudahy Packing Co.,* 33 Mont. 179, 114 Am. St. Rep. 804, 8 Ann. Cas. 717, 82 Pac. 833; *State* v. *Hoyt,* 71 Vt. 59, 42 Atl. 973; *State* v. *Richards,* 52 N. J. L. 156, 18 Atl. 582.) Such a construction is also inconsistent with the requirement of uniformity in section 1 of Article XII of the Constitution. The only proper classification of property for taxation is one with reference to the nature of property and the uses to which it is applied.

As a United States patent has issued for the land in question, and there was excepted from the grant to the Northern Pacific Railroad Company all mineral lands, the land department, by the issuance of a patent, decided that the land does not contain mineral other than coal or iron. (*Barden* v. *Northern Pacific R. Co.,* 154 U. S. 288, 38 L. Ed. 992, 14 Sup. Ct. Rep. 1030.) The decision thus made must be taken as conclusive on the officers of the state exercising the taxing power, at least until minerals other than coal and iron have been developed and exposed in the land.

One of the rules for the construction of statutes and constitutions is that some meaning and significance must be given to every word used where it is possible to do so. (*State* v. *Cave,* 20 Mont. 468, 52 Pac. 200; *State* v. *Woodman,* 26 Mont. 348, 67 Pac. 1118.) The section of the Constitution under consideration refers to "All mines and mining claims." The word "mines" must be taken to mean something different from the words "mining claim" or otherwise there is no reason for its use. The word "mine" meant at the time of the adoption of the Con-

stitution, and now means, any land containing valuable mineral deposits whether located as a mining claim or not. It is synonymous with "mineral land." (*Davis* v. *Weibold,* 139 U. S. 507, 35 L. Ed. 238, 11 Sup. Ct. Rep. 628; *Dower* v. *Richards,* 151 U. S. 658, 38 L. Ed. 305, 14 Sup. Ct. Rep. 452, 17 Morr. Min. Rep. 704; *Colorado Coal & Iron Co.* v. *United States,* 123 U. S. 307, 31 L. Ed. 182, 8 Sup. Ct. Rep. 131; *Standard Quicksilver Co.* v. *Habishaw,* 132 Cal. 115, 64 Pac. 113; *Nephi Plaster & Mfg. Co.* v. *Juab County,* 33 Utah, 114, 14 L. R. A. (n. s.) 1043, 93 Pac. 53.)   The legislative assembly has at all times used the word "mines" without reference to the law of the United States pursuant to which title to the land was acquired and as embracing any land containing mineral and that this is the sense in which the word is used in the Constitution.   (See Rev. Codes, secs. 5246, 5248, 2500, 2501.)

*Mr. D. M. Kelly,* Attorney General, and *Mr. W. H. Poorman,* Assistant Attorney General, submitted a brief in support of the contentions of Respondent and one in reply to those of Appellant; *Mr. Poorman* argued the cause orally.

It is not contended by respondent that the state may assess coal or other mineral as such, "as it lies impacted between the stratas of stone, slate or clay in the state of nature"; for in its natural state, coal will pass with a conveyance of the land as a part of the real property.   We maintain that by reason and virtue of the reservation, an actual freehold estate of inheritance in the land—in the real property itself—remains vested in the appellant, and that as such estate, it is subject to assessment and taxation.   The sole question therefore is: Does the reservation contained in the deed of conveyance from appellant company to its grantees, create or reserve in the appellant "an estate in land," within the meaning of the assessment and taxation laws of this state?   Under section 2501, Revised Codes, the interest so reserved by appellant must be classed as real estate.   "The coal thus reserved by the grantor of the land is not personal property and cannot be until it is severed.   By the conveyance of it

an interest in the land itself passed to the grantee, the ownership of portions of the constituents of the land, and falls within the designation of real estate." (*State* v. *Downman* (Tex. Civ. App.), 134 S. W. 787; see, also, *State* v. *Mayor*, 68 N. Y. 552; *Benavides* v. *Hunt*, 79 Tex. 383, 15 S. W. 396; *Gordon* v. *Million*, 248 Mo. 155, 154 S. W. 99; *Board of Commissioners* v. *Lattas Creek Coal Co.* (Ind.), 100 N. E. 561.) So long as the entire estate is vested in one person the total value is assessed to him, but when he has sold a part of it, as he has a right to do, why should he still be charged with the assessment of the whole, and that, too, although the mineral estate conveyed is or may be far the more valuable? A piece of land, plus the mineral estate, is certainly more valuable than the same piece of land minus the mineral estate.

As pointed out in the above cases, it is not necessary that coal be actually discovered in the land, for the estate thus created is an estate in the land itself. (*Consolidated Coal Co.* v. *Baker*, 135 Ill. 545, 12 L. R. A. 247, 26 N. E. 651.) The estate reserved in the plaintiff is unlimited in point of time, for it continues "forever." It is unlimited as to the character of mineral reserved, for it includes "all mineral of any nature whatsoever upon or in said land." It not only includes coal and iron but also gold, silver, copper, lead, tin, platinum, oil, gas, and even limestone. It is as much an estate in land as though the reserve was that of the sand, clay and gravel "upon or in said land."

The terms "mines" and "mining claims," as used in both the Constitution and the statute, are for all practical purposes synonymous in meaning; for "the word 'mine,' as used in mining law, may be used to designate 'the whole claim or body of the mining ground.'" (*Smith* v. *Sherman Min. Co.*, 12 Mont. 524, 31 Pac. 72.) As distinguished from "mining claims" it is defined to be "a pit or excavation in the earth from which metallic ores or other mineral substances are taken by digging." (*Marvel* v. *Merrit*, 116 U. S. 11, 29 L. Ed. 550, 6 Sup. Ct. Rep. 207.) "Mining claim" is defined as: "The name given to a portion of

the public mineral lands which the miner for mining purposes takes up and holds in accordance with mining laws. It is not merely a vein or lode, but that with a certain quantity of surface ground." (*Mount Diablo Mill. & Mining Co.* v. *Callison,* Fed. Cas. No. 9886, 5 Saw. 439, 9 Morr. Min. Rep. 616; *Salisbury* v. *Lane,* 7 Idaho, 370, 63 Pac. 383.) It is safe to assert that no case can be found defining the phrase "mining claim" that does not have direct reference to the mineral or coal land laws of the United States in the states where such mining laws operate.

The full power of the state to classify property within its boundaries, for the purposes of assessment and taxation, has been so thoroughly discussed by the supreme court of the United States that we here cite, without further discussion, those authorities: *Bell's Gap R. R. Co.* v. *Commonwealth of Pennsylvania,* 134 U. S. 232, 33 L. Ed. 892, 10 Sup. Ct. Rep. 533; *Citizens' Telephone Co.* v. *Fuller,* 229 U. S. 322, 57 L. Ed. 1206, 33 Sup. Ct. Rep. 833. After all, the question of classification goes only to the amount of the assessment, and not to the right of assessment, and the amount of the assessment is not involved in this case. The proceeds of a mine may be assessed and taxed although title to the land still remains in the government and is not subject to taxation. Hence the assessment of "net proceeds" is not any assessment of the land or of any estate therein. (*Forbes* v. *Gracey,* 94 U. S. 762, 24 L. Ed. 313, 14 Morr. Min. Rep. 183.)

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

Under the grant of July 2, 1864, section 23, township 3 south, range 8 east, and section 31, township 4 north, range 10 east, in Park county, were transferred by the government to the Northern Pacific Railroad Company. The Northern Pacific Railway Company succeeded to the ownership of these lands, and some time prior to the first Monday of March of this year it conveyed section 23 to Bernhard Blome, and section 31 to another purchaser. Each deed contained this provision: "Excepting and

[1]    reserving unto the grantors its successors and assigns, forever, all mineral of any nature whatsoever upon or in said land including coal and iron, and also the use of such surface ground as may be necessary for exploring for and mining or otherwise extracting and carrying away the same.''    These reservations were listed for taxation, and, to forestall action by the county treasurer, the railway company commenced this suit to cancel the assessments and to restrain the collection of the tax.    It is alleged that no exploration has been made upon section 23 for minerals or coal and it is unknown whether the land contains either.    With reference to section 31, the complaint alleges: ''That no coal, iron or other mineral has ever been extracted from said land, but as plaintiff is informed and believes and alleges said land contains coal.''    The trial court sustained a general demurrer to the complaint, and the railway company, electing to stand upon its pleading, suffered judgment to be entered against it and appealed.

We are called upon to determine whether that which the company reserved to itself in each of these parcels of land constitutes property which is subject to taxation under the Constitution and laws of this state.

That neither deed conveys the entire estate to the land described is apparent.    That each carves out some interest which the grantor retains is not open to question, and that this interest is an estate in land must be conceded.    The coal deposits which underlie section 31 form a part of the real estate within the definition given in section 2501, Revised Codes; and the reservation of those deposits, with the right to mine, constitutes an interest in real estate.    While subsequent development may demonstrate that there are not any minerals or coal in section 23, still the right to explore for minerals, which includes the right to the possession of any portion, or all, of the surface if necessary, is an interest in the land as a whole.    Section 2501, above, provides that ''the term 'real estate' includes: The possession of, claim to, ownership of, or right to, the possession of land.''    And this would be the rule independently of statute.

"The word 'property' includes moneys, credits, bonds, stocks, franchises and all matters and things real, personal and mixed, capable of private ownership." (Mont. Const., sec. 17, Art. XII; *Buck* v. *Walker*, 115 Minn. 239, Ann. Cas. 1912D, 882, and note, 132 N. W. 205; *Benavides* v. *Hunt*, 79 Tex. 383, 15 S. W. 396; *Gordon* v. *Million*, 248 Mo. 155, 154 S. W. 99; *Board of Commissioners* v. *Lattas Creek Coal Co.* (Ind.), 100 N. E. 561.) But the particular character of these property rights is not of consequence now. Each reservation is property, and all property in this state is subject to taxation, except such as is exempt. (Sec. 2498, Rev. Codes.) The only property specifically exempted is enumerated in section 2499, Revised Codes, as follows: "The property of the United States, the state, counties, cities, towns, school districts, municipal corporations, public libraries, such other property as is used exclusively for agricultural and horticultural societies, for educational purposes, places of actual religious worship, hospitals, and places of burial not used or held for private or corporate profit, and institutions of purely public charity are exempt from taxation, but no more land than is necessary for such purpose is exempt." Since these reserved rights do not fall within any of the classes of exempt property, they are subject to assessment for taxation, unless by some provision of the state Constitution they are relieved from the burden. The contention of appellant is that they are exempt by virtue of section 3, Article XII, which provides: "All mines and mining claims, both placer and rock in place, containing or bearing gold, silver, copper, lead, coal or other valuable mineral deposits, after purchase thereof from the United States, shall be taxed at the price paid the United States therefor, unless the surface ground, or some part thereof, of such mine or claim, is used for other than mining purposes, and has a separate and independent value for such other purposes, in which case said surface ground, or any part thereof, so used for other than mining purposes, shall be taxed at its value for such other purpose, as provided by law; and all machinery used in mining, and all property and surface improvements upon or appurtenant to

mines and mining claims which have a value separate and independent of such mines or mining claims, and the annual net proceeds of all mines and mining claims shall be taxed as provided by law.''

Our Constitution is not a grant of power, but a limitation—particularly a limitation upon legislative action. In [2] section 2 of Article XII the framers declared what property shall be, and what other property may be, exempted from the burden of taxation. Generally speaking, the public property of the United States and of the state and its subdivisions constitutes the first class, and the property of eleemosynary and educational institutions and places of burial not used for profit comprise the second. Having thus determined what property should or might be relieved from the necessity of contributing to the expense of government, the problem before the constitutional convention was, not how to exempt mining property from taxation, but rather how to compel it to respond to the reasonable demands of the state for revenue, and at the same time protect it against such exactions as would or might discourage prospecting or development. The debates of the convention, so far as they are available in their unpublished form, disclose this fact, and the history of our mining legislation furnishes added evidence of the correctness of this conclusion. The first revenue measure adopted in 1864 specifically exempted mining claims from taxation. (Bannack's Statutes, p. 411.) The next statute in terms exempted mines and mining claims. (Fifth Session, p. 41.) The succeeding Act exempted ''mines and mining claims except those held under a patent from the United States.'' (Laws 7th Sess., p. 600.) By an Act approved February 21, 1879, the net proceeds of mines were made subject to taxation, and it was further provided: ''That from and after the passage of this Act, no direct tax shall be levied upon any placer claim, quartz lead, or lode, except to the extent of the price paid for any mining claim in obtaining patent therefor from the government of the United States, and the only taxation of the proceeds thereof shall be that provided in this Act.'' (Laws 11th Sess.,

p. 65.) This was succeeded by the Act of March 10, 1887, which specifically exempted from taxation ''mines, except on the net proceeds thereof, and mining claims, except those held under a patent from the United States, the surface of which shall be taxed as other real estate.'' (Comp. Stats. 1887, Fifth Div., p. 1108.) This was the status of mining property before the revenue law, at the time the constitutional convention met in 1889.

During the life of the territory, public property was always exempt; but in addition certain private property as well shared the privilege of being relieved from the burden of maintaining the government. Doubtless, as an aid to the encouragement of the mining industry, mines and mining claims were placed in the exempt class, except for the period from 1872 to 1879, during which time patented mining claims were subject to taxation as other property; but this was corrected by the Act of the Eleventh Session above, and, at the time section 3 of Article XII was under consideration, mines and mining claims, as such, were exempt from taxation. The net proceeds of mines were taxed as other taxable personal property, and the surface of a patented mining claim was subject to taxation as other taxable real estate. When, then, the framers of the Constitution removed this species of property from the exempt to the taxable class, they must be held to have acted deliberately with the purpose, as disclosed by their debates, of subjecting mines and mining claims to what in their judgment was the equitable proportion of the burden of governmental expense.

Instead of section 3, Article XII, being a provision exempting property from taxation, it is in fact a revenue measure. It fixes an arbitrary valuation upon the surface of patented mining claims, as such, and provides the method by which the value of a mine shall be determined, *viz.*, by the net value of its proceeds; but neither is relieved from producing its proportion of the revenue upon the basis thus established. While this provision does not exempt the nonproducing mine, by implication at least it determines that such a mine, independently of its surface, does not

have any value for the purpose of taxation, whatever value it may have as a speculative or commercial enterprise, and likewise that minerals, while in *a mine* or *mining claim,* have no taxable value.

Counsel for appellant apparently concede that most of what has been said is correct, but insist that since the surface of each of these parcels of land has been assessed to the purchaser, and since neither parcel has ever yielded any net proceeds from mining operations, there is not anything upon which to fix a valuation for the purpose of assessment, and consequently nothing to tax. The indispensable premise to this conclusion, however, is that the thing which is reserved in each instance is a mine or it is something without value. That definitions of the word *"mine"* sufficiently comprehensive to include the reservation in section 31, and possibly that in section 23, may be found, must be conceded at once. To indicate their scope, a few illustrations will suffice: A mine is: "An opening or excavation in the earth for the purpose of extracting minerals." (Anderson's Law Dictionary.) "An excavation in the earth for the purpose of obtaining minerals." (Bouvier's Law Dictionary.) "A pit or excavation in the earth from which metallic ores or other mineral substances are taken by digging." (Black's Law Dictionary.) "An excavation in the earth from which some useful product is extracted. A deposit of useful material." (English's Law Dictionary.) "An opening in the earth made for the purpose of taking out minerals, and in case of coal mines, commonly a worked vein." (Kinney's Law Dictionary & Glossary.) "A work for the extraction of minerals by means of pits, shafts, levels, tunnels," *etc.* (Rapalje & Lawrence's Law Dictionary.) "An underground excavation made for the purpose of getting minerals." (Stroud's Judicial Dictionary.) "Quarries or places where anything is digged." (Jacob's Law Dictionary.) "An excavation properly underground for digging out some useful product as ore, metal or coal. Any deposit of such material suitable for excavation and working, as a placer mine." (Standard Dictionary.) "An excavation in the earth

made for the purpose of getting metals, ores or coal. When the term 'mine' is used it is generally understood that the excavation so named is in actual course of exploitation, otherwise some qualifying term is required.'' (Century Dictionary.) ''The underground passage and workings by which the minerals are gotten, together with these minerals themselves.'' (Bainbridge on Mines, p. 2.) ''A mine is not properly so called until it is opened; it is but a vein of coal before.'' (*Astry* v. *Ballard,* 2 Mod. 193, 8 Morr. 316.) ''It may be conceded that the term 'mine' when applied to coal is generally equivalent to a worked vein, for by working the vein it becomes a mine.'' (*Westmoreland Coal Co.'s Appeal,* 85 Pa. 344.) ''Coal Mine: A mine or pit from which coal is obtained.'' (7 Cyc. 266.) ''The mode ·of obtaining the material and not the nature of the material itself is to be considered in order to come to a decision whether it constitutes a mine.'' (Denman, C. J., in *Rex* v. *Dunsford,* 2 Ad. & E. 568, 4 L. J. M. C. 59.) In speaking of the terms ''known mine'' as used in the pre-emption statute, the supreme court said: ''It will thus be seen that, so far as the decisions of this court have heretofore gone, no lands have been held to be known mines unless at the time the rights of the purchaser accrued there was upon the ground an actual and opened mine which had been worked or was capable of being worked.'' (*Colorado Coal etc. Co.* v. *United States,* 123 U. S. 307, 31 L. Ed. 182, 8 Sup. Ct. Rep. 131.) In *Davis* v. *Weibbold,* 139 U. S. 507, 35 L. Ed. 238, 11 Sup. Ct. Rep. 628—a case involving the townsite of Butte—the court speaks of mines which lay buried, unknown in the depths of the earth. These definitions serve no other purpose than to disclose the wide range covered by lexicographers, courts and text-writers in their attempt to define what would appear at first blush to be a very simple term, and to confirm Mr. Ross Stewart, the learned Scotch law-writer, in his assertion that ''the terms 'mine' and 'mineral' are not definite terms; they are susceptible of limitation according to the intention with which they are used; and in construing them, regard must be had not only to the deed or statute in which they

occur, but also to the relative position of the parties interested and the substance of the transaction or arrangement which the deed or statute embodies. Consequently, in themselves, these terms are incapable of a definition which would be universally applicable.'' (Stewart on Mines, p. 1.)

The determination of this controversy depends upon the meaning attached to the term ''mine.'' Of necessity any definition adopted must be formulated more or less arbitrarily—grounded, as it will be, upon the intention of the framers of the Constitution as that intention is gathered from the Constitution itself and from contemporaneous history. Starting our investigation with the premise that in formulating section 3 the constitutional [3] convention had under consideration the subject ''revenue,'' and was concerned with the question of producing sufficient funds to support the government, the elementary rules of construction, as well as the dictates of reason, require that, if there is a doubt as to the sense in which the term ''mine'' is used in that section, the doubt should be resolved in favor of a definition under which public revenue will be raised, rather than one which will defeat the obvious purpose of the convention. Conscious of the fact that the meaning of this term will be varied largely by the context or by the character of the instrument in which it is found, it devolves upon us to determine, if possible, the particular significance which the framers of the Constitution attached to the word ''mine,'' independently of the surface ground, when they employed it in section 3 of Article XII. The idea of taxing the net proceeds of a mine was not new to them. For more than ten years the plan had prevailed in the revenue laws of the territory. Its operations had been tested, and its results were matters of history. There was not any room for doubt as to the meaning of the word ''mine'' in those statutes. They spoke from the standpoint of raising revenue. The Act of 1879 is entitled ''An Act to provide for the taxation of the proceeds of mines,'' and section 1 provided that every person, corporation, or association engaged in mining upon any quartz vein or lode or placer mining claim should furnish to the assessor

annually a verified statement of the gross yield and necessary expenses of his or its mining operations, and that a tax should be levied upon the net proceeds. That legislative assembly in effect declared that the developed but dormant mine was without any value for the purpose of taxation, while the diminutive products of mining claims doubtless furnished sufficient excuse for the failure to mention them. The one predominant idea running through the legislation was that consideration was given only to the active, open and working mining property whose development had proceeded past that point which marks the boundary between a mining claim and a mine. To the members of the eleventh territorial legislative assembly the word "mine" meant a developed mining property, yielding or in a condition of development capable of yielding revenue upon the basis of the value of its gross output, less the necessary cost of mining operations and expense of reduction. The very subject matter under consideration, the plan adopted for carrying their ideas to practical results, the language employed to give expression to their views, and their knowledge of existing exemption statutes, preclude the possibility that any hidden, unknown or undeveloped deposit of ore or coal was ever contemplated as within the meaning of the term "mine."

When the framers of the Constitution formulated their ideas into Article XII, they caused all private property, except that enumerated in section 2, to be transferred from the exempt to the taxable class. In their zeal to compel every species of property to contribute to public expense, they included, as subject to taxation, the net returns from development or representation work on mining claims, however insignificant they might be. They also impliedly declared that a nonproducing mine has no taxable value, and there is not the slightest evidence that they used the term "mine" in any different sense from that employed in the Act of 1879. On the contrary, aside from the persuasive fact that they were dealing with the subject "revenue" and must have contemplated something in a condition which would or might produce revenue, we have the added force and effect of a

legislative construction of section 3, from the time of its adoption in 1889, to the present time.

There has been no period in the history of the state when the provisions of the Act of 1879, in every substantial particular, have not been in full force and effect. They were reproduced in the first revenue measure enacted after statehood (Laws 1891, p. 93, sec. 50 *et seq.*), carried into the Political Code of 1895 (secs. 3760–3768), and are now found as the existing law upon the subject, in sections 2563–2571, Revised Codes. The identity of expression, the harmony of plan, and the unity of purpose pervading these several measures, forbid the imposition of a different definition for the term ''mine'' in our state statutes, from that which was attached by the legislative assembly of 1879. [4] For twenty-four years that definition has been accepted and acted upon by the legislative branch of our state government, and we thus have a construction of section 3—a construction manifestly in harmony with the views of the framers of that section themselves—but whether so or not, in the absence of anything to indicate a contrary purpose, that construction is entitled to most respectful consideration. (*State ex rel. Haire* v. *Rice,* 33 Mont. 365, 83 Pac. 874; *Johnson* v. *City of Great Falls,* 38 Mont. 369, 16 Ann. Cas. 974, 99 Pac. 1059.) It will not do for us to adopt a particular definition of the word ''mine'' merely because some other court has chosen the same definition. For example: In *Forbes* v. *Gracey,* 94 U. S. 762, 24 L. Ed. 313, 14 Morr. Min. Rep. 183, the supreme court of the United States held that the term ''mining claim,'' as used in the Nevada statute, referred only to an unpatented claim held under the mineral laws; but such a definition never could have prevailed in Montana, for, from our first territorial legislation to the present time, a mining claim included one held under patent as well as one held merely by location before patent. The most elementary rules of construction require that we ascertain the intention of the framers of the Constitution and this we may do only so far as that intention is disclosed in the language employed when considered with the context, in the light of our history, the sur-

rounding circumstances, the subject matter under consideration, and the object sought to be attained.

While it is impossible for anyone to know with certainty what meaning the framers of our Constitution attached to the terms "mines" and "mining claims" in section 3, the application of those tests, denominated rules of construction, adopted and acted upon by courts throughout the civilized world, leads us to the [5] conclusion that a mining claim, as therein used, indicates a tract of land to which the right of possession or the title has been acquired pursuant to the Acts of the Congress relating to the disposition of mineral lands, including coal lands, and that a mine, independently of the surface, in the revenue sense as therein employed, is a mineral deposit, whether metallic or non-metallic, developed to the point of production and actually yielding, or capable of yielding, proceeds.  The character of legislation, under which title or right of possession is acquired, is not a controlling factor at all.  A mine upon a patented homestead is not less a mine because title from the government was acquired under laws providing for the disposition of agricultural lands only; and an undeveloped body of ore is not a mine though title to it was secured under the mineral laws, but it is merely a part of the real estate itself.  In providing a fundamental law for the new state, the framers of our Constitution spoke in comprehensive terms; but we decline to believe that they used the word "mine" in section 3, in a sense which would include hidden, unknown or undeveloped deposits of ore or coal.  In that section they spoke with reference to revenue and referred to something which would or might produce revenue in its present state of development.  It was not necessary for them to consider rich deposits developed to the point of production but not operated. They were men of broad experience in this western country. They knew something of human nature, something of the prospector's daydreams of wealth, something of humanity's greed for gold.  The avarice of man was doubtless deemed a sufficient dynamic force to subject all paying properties to constant employment, and justified their implied declaration that an

unworked mine is not of sufficient value to justify the expense of taxation. Our conclusion is that neither reservation involved in this controversy constitutes a mine within the meaning of that term as employed in section 3, Article XII, of the Constitution, but each is an interest in real estate. Land may be divided horizontally as well as vertically. That several estates in the same land may be owned by different parties is recognized gen-
[6] erally. One may own the surface, another the growing timber, and a third the minerals underground, and each estate be subject to taxation. (*Smith* v. *Mayor,* 68 N. Y. 552.)

It will not do to say that, because neither of these reservations produces revenue, it is not of any value. From the very act of making the reservation, the presumption arises that each interest has some appreciable value, or the reservation would not
[7] have been made. Taxation is the rule, exemption is the exception; and, if either of these rights in fact is valueless, the burden is upon the party, claiming to come within the exception, to allege and prove the facts necessary to bring his property within the favored class. (*State* v. *Downman* (Tex. Civ. App.), 134 S. W. 787.)

The asserted right to tax these reservations rests entirely upon the fact that each constitutes an interest in real estate, and that neither is a mine or a mining claim within the meaning of section 3, Article XII, of our Constitution.

Section 1 of Article XII imposes upon the legislative assembly the duty to ''prescribe such regulations as shall secure a just valuation for taxation of all property, except that specifically provided for in this article.'' But this is only one of several injunctions laid upon the lawmakers by the Constitution. Of course, the legislative assemblies should give heed to these commands, but if they fail there is not any remedy. They cannot be coerced except by public opinion. We doubt, however, that anything more was contemplated by this provision of the Constitution than has been provided by law. Section 2502 declares that ''all taxable property must be assessed at its full cash value.'' The duties of the county assessor are prescribed. A

tribunal is created to review his acts, and every opportunity is afforded a dissatisfied taxpayer to present his grievances and have them determined ór his assessment duly equalized. The [8] difficulty which may confront the assessor in determining the full cash value of a property interest of this character cannot operate as a factor in characterizing the interest itself.

In the absence of any allegation bringing either of these rights within the definition of a mine, or disclosing that they are, or ·either of them is, valueless, the complaint fails to state a cause of action. If this conclusion in its ultimate analysis involves a classification of property, which will result in denying to any person within this jurisdiction the equal protection of the laws— and we do not think that it does—the responsibility must rest upon the framers of our Constitution, who, in their zeal to promote the mining industry, arbitrarily gave to mines and mining claims a status before the law not enjoyed by other species of property.

The judgment is affirmed.                              *Affirmed.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE SANNER concur.

