UNITED STATES GYPSUM COMPANY, a Corporation, Plaintiff and Respondent, v. FLORENCE SCHREINER, County Treasurer, Fergus County, and the STATE BOARD OF EQUALIZATION, Defendants and Appellants.

No. 9813.
Submitted April 8, 1959. Decided June 5, 1959.
340 Pac. (2d) 548.

MR. JUSTICE BOTTOMLY, dissented.

Forrest H. Anderson, Atty. Gen., William F. Crowley, Asst. Atty. Gen., George T. Bennett, Sp. Asst. Atty. Gen., Charles

Marshall, County Atty., Raymond E. Dockery, Deputy County Atty., Lewistown, for appellants.

George T. Bennett, Chief Tax Counsel for Board of Equalization, Helena, argued orally.

Ralph J. Anderson and Stanley P. Sorenson, Helena, for respondent.

Ralph J. Anderson argued orally.

MR. JUSTICE CASTLES:

This appeal is from a judgment of the district court of Fergus County in favor of the plaintiff involving taxation of net proceeds of mines. The appellants are the Fergus County Treasurer and the State Board of Equalization hereinafter referred to as the Board. The respondent is a mining operator of gypsum properties and will be referred to as the Company. Judgment in the district court was entered for the plaintiff for refund of tax paid under protest in the sum of $5,897.77 and costs.

The Company had filed its net proceeds tax return in 1952, claiming an item of deduction of some $235,155 as a cost of production, repairs and betterments of mines during the year and as development expenses.

The Board disallowed the claimed deduction of $235,155 as not an allowable deduction under the law. The Board contended that R.C.M. 1947, section 84-5403, as amended, spells out the only deductions allowable, and that it permits a deduction for "development expense," incurred on developing a mine, but not for "cost of construction." It was the Board's theory that the Company operated *two separate mines* and that it must show gross value of the produce of *each,* and the deductions claimed must be confined to each separate mine and subtracted from the gross value of production from that particular mine.

The Company operates a gypsum plant at Heath, Montana, where it makes various gypsum materials. In connection with this plant it mines gypsum ore. At its mining operation, there are two somewhat parallel ridges sloping westward with their crest to the east. Between the two ridges is a coulee known as

Shoemaker Coulee. In 1928 the Company operated its mine in the southerly ridge by means of tunnels, etc. In 1951 this part of the gypsum deposit became largely exhausted, whereupon the Company continued its operation by crossing the coulee from the south adit on a small fill to the north side where it again entered into a tunnel. In the coulee, it installed a rock crusher which was used to crush the gypsum rock so that it might be more easily and economically transported to the plant by means of conveyor belt through the adit in the old workings. Part of the Company's production in 1951 was from both sides of the coulee; that is, the "old workings" and the "new workings."

The Board asserts that the two sides of the coulee each constitute a mine under the Net Proceeds Tax Act (R.C.M. 1947, section 84-5401 et seq.) ; that the gross yield from the new workings, or what it refers to as Hill No. 2, was $114,303.36; and that the claimed deduction of $235,155 was for construction purposes and not an allowable deduction as development purposes.

The Board found that the gross yield of the Company's operation was $333,220. They allowed deductions of $274,207 leaving net proceeds of $59,013. The Board disallowed $235,-155. Thus under the Board's contention a tax was due. Under the Company's contention a net loss resulted, and no tax was due.

One of the exhibits, a letter addressed to the Board by the Company, will perhaps give a better understanding of the issue involved than our own attempt to explain it:

"Mr. M. B. Milligan, General Auditor, states in his letter of July 19, 1952, that this deduction was eliminated because it 'was incurred in opening up a new mine and we have, therefore, eliminated it in computing your net proceeds, as expenditures incurred in connection with the development or operation of any mine cannot be charged against another.'

"Taxpayer claims that these expenditures were not for the development of a 'new mine' but merely the extension of the

present mine. The vein of gypsum rock we are mining, which is the same vein we have been mining for many years, extends under practically the entire area surrounding our plant. Due to erosion, there is a light dip in the topography at one point in the area in which we are mining and, in the interest of economy, rather than go around or under this dip, we decided to bridge it. This situation is no different than if the vein disappeared for a distance of 20 or 30 feet within the mine and it was necessary to do development work to again find the vein and continue mining it.

"Taxpayer further wishes to point out that rock is actually being transported through the mine exactly as it has been in the past. The only difference being that instead of being continuously underground, the rock crosses the dip on a conveyor belt. In addition, the identical mining, haulage, crushing and transportation equipment is being used; the only change being an extension of the haulage system."

The only expert geological testimony in the record was presented on behalf of the Company. That testimony indicated without contradiction that the gypsum deposit is all one deposit and that Shoemaker Coulee is nothing more than the name implies. The testimony and exhibits also indicate an extensive underground operation, with a honeycombed effect by tunnels, shafts, and stopes, with various exits.

Other undisputed facts are that the entire operation is under one ownership, one management, and pursuant to a long range and integrated plan of mining. Extensive core drilling and exploration was done in advance of operations.

When the Company, in its operation, arrived at Shoemaker Coulee, it moved a crusher and hammer mill to the coulee and installed a conveyor belt through the "old workings" to its main plant. This was the principal item contained in the disallowed deduction. The testimony is undisputed that this was done simply in the interests of cheaper transportation and more efficient operations.

The gypsum deposit appears, by testimony and exhibits, as

uniform on each side of Shoemaker Coulee with identical layers of shale and gypsum; and it is obvious that the bed, vein or deposit is one and the same, being only eroded in part by Shoemaker Coulee.

The appellant Board states the question involved in this appeal as: "Did plaintiff open up and operate a second mine in 1951?"

Article XII, section 3, of the Montana Constitution provides, among other things, that "the annual net proceeds of all mines and mining claims shall be taxed as provided by law."

R.C.M. 1947, section 84-5401, provides in part that "the annual net proceeds of all mines and mining claims shall be taxed as other personal property."

The terms "mine" and "mining claim" are used in the succeeding sections of this chapter of the Code as the unit or units upon which the tax is paid.

The statutes governing the taxation of net proceeds do not define what is a mine for purposes of taxation thereunder.

The term "mining claim," as used in section 3, Article XII, was discussed by this court as follows:

"* * * a mining claim, as therein used, indicates a tract of land to which the right of possession or the title has been acquired pursuant to the acts of the Congress relating to the disposition of mineral lands, including coal lands, and that a mine, independently of the surface, in the revenue sense as therein employed, is a mineral deposit, whether metallic or nonmetallic, developed to the point of production and actually yielding, or capable of yielding, proceeds. The character of legislation, under which title or right of possession is acquired, is not a controlling factor at all." Northern Pacific Ry. Co. v. Mjelde, 48 Mont. 287, 303, 137 Pac. 386, 391. See also Northern Pac. Ry. Co. v. Musselshell Co., 54 Mont. 96, 169 Pac. 53.

A "mining claim" is not restricted to a single mining location but may include as many adjoining locations as a miner can purchase and the ground covered by all will constitute a mining claim.

"There is nothing in the reason of the thing, or in the language of the acts, which prevents an individual from acquiring by purchase the ground located by others and adding it to his own. The difficulty with the court below, as seen in its charge, evidently arose from confounding 'location' and 'mining claim,' as though the two terms always represent the same thing, whereas they often mean very different things. A mining claim is a parcel of land containing precious metal in its soil or rock. A location is the act of appropriating such parcel, according to certain established rules. It usually consists in placing on the ground, in a conspicuous position, a notice setting forth the name of the locator, the fact that it is thus taken or located, with the requisite description of the extent and boundaries of the parcel, according to the local customs, or, since the statute of 1872, according to the provisions of that act. Rev. Stat., section 2324 [30 U.S.C.A. section 28]. The location, which is the act of taking the parcel of mineral land, in time became among the miners synonymous with the mining claim originally appropriated. So, now, if the miner has only the ground covered by one location, 'his mining claim' and 'location' are identical, and the two designations may be indiscriminately used to denote the same thing. But if by purchase he acquires the adjoining location of his neighbor,—that is, the ground which his neighbor has taken up,—and adds it to his own, then his mining claim covers the ground embraced by both locations, and henceforth he will speak of it as his claim. *Indeed, his claim may include as many adjoining locations as he can purchase, and the ground covered by all will constitute what he claims for mining purposes, or, in other words, will constitute his mining claim, and be so designated.* Such is the general understanding of miners and the meaning they attach to the term." Emphasis supplied. St. Louis Smelting & Refining Co. v. Kemp, 104 U. S. 636, 648, 649, 26 L. Ed. 875.

The California court has stated that it is common to consolidate two or more mining locations into one claim and thereafter to treat and work them as one claim; that after such a consoli-

dation the different locations cease to constitute different claims and become in law, as they are in fact, only parts of one claim.

In Tredinnick v. Red Cloud Consolidated Min. Co., 72 Cal. 78, 13 Pac. 152, 155, the California court said: "It has been common in this state to consolidate two or more mining locations into one claim, and thereafter to treat and work them as one claim. After such a consolidation, the different locations cease to constitute different claims, and become in law, as they are in fact, only parts of one claim."

The above case was cited and approved by the Montana court in Smith v. Sherman Min. Co., 12 Mont. 524, 529, 31 Pac. 72.

The Supreme Court of Utah in Nephi Plaster & Mfg. Co. v. Juab County, 33 Utah 114, 118, 93 Pac. 53, 55, 14 L.R.A., N.S., 1043, in discussing the word "mine," holds to the same broad view, quoting with approval Lindley on Mines to the effect that "mine" may denote an aggregation of veins. The court said:

"The question, however, is, what is to be deemed as being within the popular conception of a mine? Is it to be confined to the understanding that a farmer, stock raiser, or ordinary merchant has of the term? Or to what those who work in or come in contact with mines and mining rights generally and popularly understand it to be? Or is it to be understood, when found in a statute or constitution, what the courts generally have held it to mean? In view that the decisions of courts are but the reflection of the common understanding with respect to particular things and the terms used in any industry, business, or calling, and are thus simply reduced to legal terms, we think that if the courts have construed and applied what is meant by the terms 'mine' and 'mines,' then this meaning must control, and especially so when the term is used in some statute or Constitution. This must be so for the simple reason that the term will then have acquired a legal meaning, which, unless the contrary clearly appears from the context, must be deemed to be the meaning intended to be applied to it in the law in which it is found.

"In 1 Lindley on Mines, sections 87 to 97, the author reviews

the authorities and discusses the meaning of mines and minerals, and there points out that anciently the term 'mine' or 'mining' meant subterranean excavation. But in section 89 the author points out that the term 'mine' has received an enlarged meaning in later times. He says: 'These primary significations were soon enlarged, so that in time the word "mine" was construed to mean, also, the place where minerals were found, and soon came to be used as an equivalent of "vein," "seam," "lode," or to denote an aggregation of veins, and, under certain circumstances, *to include quarries and minerals obtained by open workings'.*" Emphasis supplied.

However, we have said obiter dicta that the same rules relating to statutory assessment work on mining claims apply to the calculation of net proceeds tax on mines. In Rice Oil Co. v. Toole County, 86 Mont. 427, 431, 284 Pac. 145, 146, the plaintiff sued to recover taxes paid under protest. In 1925 the plaintiff was drilling upon, and extracting oil from two 80-acre tracts by virtue of two operating agreements. These tracts were known as the Byrne tract and the Stannard tract, respectively. The plaintiff operated the Byrne tract at a loss of approximately $45,000, while the net proceeds from the operation of the Stannard tract were large. Upon the theory that the two tracts were operated as a mine, plaintiff, in its return, claimed the right to deduct the losses sustained on the Byrne tract from the profits realized from the Stannard tract. This claim was denied by the State Board of Equalization. The court upheld this position of the Board's decision, saying in part:

"Upon the postulate that an oil well is a mine it is sought to apply to adjoining tracts of ground held under oil leases the rules governing the development and operation of mining claims held in group.

"From the earliest period in which mining for gold and silver was pursued as a business, says Mr. Lindley in his standard work on Mines, section 630, miners were in the habit of consolidating adjoining claims, whether they consisted of one or more original locations, into one, for convenience and economy in

working them (St. Louis Smelting & Refining Co. v. Kemp, 104 U. S. 636, 26 L. Ed. 875; 11 Morr. Min. Rep. 673; Jackson v. Roby, 109 U. S. 440, 3 S. Ct. 301, 27 L. Ed. 990, and that policy was made applicable to the performance of annual assessment work upon mining claims by section 2324, United States Revised Statutes (U. S. C. A., Title 30, Chapter 2, section 28), which provides that, 'where such claims are held in common, such expenditure may be made upon any one claim.'

"In applying the law it was held generally that claims must be contiguous (Chambers v. Harrington, 111 U. S. 350, 4 S. Ct. 428, 28 L. Ed. 452), that there must be a community of interest in each claim (Eberle v. Carmichael, 8 N. M. 169, 42 Pac. 95; Lindley on Mines, 2d ed., section 630), and that the work performed or improvements made must manifestly tend to the development of all the claims in the group (Copper Mountain M. & S. Co. v. Butte & Corbin Con. Copper & Silver Min. Co., 39 Mont. [487], 489, 104 Pac. 540, 133 Am. St. Rep. 595). The cardinal principle is that the work done upon one claim or more must inure to the benefit of all.

"It is true that the term 'mine' means mining property so developed as to yield, or to be capable of yielding, a profit, and this regardless of how the title to the land in which the mineral is found has been acquired (Northern Pac. Ry. Co. v. Mussel-shell County, 54 Mont. 96, 169 Pac. 53), but this does not trench upon the rules above announced. The principle that the work done upon the consolidated property shall be designed for the benefit of the property as a whole is still controlling."

The court then analyzed the facts in the case before it and found that there was no community of interest as required by the second criterion in the quotation above. The court further demonstrated that it considered the oil and gas field differently from metalliferous mines in the following language:

"To what extent sinking wells, generally far apart, over wide areas in developing, or attempting to develop, an oil field is analogous to mining within the law as above outlined, need not

be considered, and the question is one upon which we reserve an opinion. * * *

"The only community of interest which appears is in the operating company, the plaintiff, which desired to operate the leases economically and with advantage to itself. It was not contemplated by anyone that the oil from either tract should be extracted by a well driven upon the other tract. Far from it, for the owners of the land and their lessees are much interested in seeing that none of the oil underlying their respective tracts is extracted by means of a well or wells upon the other tract. Precautions are taken to avoid such a contingency. Instead of a common interest in the 'mine' the interests of the land owners and their lessees in the respective tracts are antagonistic. Any encroachment by one upon the other's oil lessens the royalty income. The situation presented here is so radically at variance with the principles governing the working of metalliferous mines that nothing further need be added."

The case was remanded upon other grounds with instructions to modify the judgment.

Upon principle it seems improper to apply this three-fold test, viz., (a) that the claims must be contiguous; (b) that there must be a community of interest; (c) that the work done upon one must inure to the benefit of all, to determine whether a given operation constitutes a "mine" or "mining claim" within the meaning of our net proceeds statutes because this triple test was developed and is generally used only to determine whether a group of claims is "held in common" within the meaning of 30 U. S. C. A. section 28.

In the instant case, the "old workings" and the "new workings" are contiguous. Our court has, upon several occasions, reiterated the necessity of contiguity of mining claims in order to have assessment work done on one claim apply to all of a group of claims. Power v. Sla, 24 Mont. 243, 61 Pac. 468; Copper Mountain Mining & Smelting Co. v. Butte & Corbin Co., 39 Mont. 487, 104 Pac. 540, 133 Am. St. Rep. 595.

But in view of decisions holding that this rule is not an abso-

lute one (Big Three Mining & Milling Co. v. Hamilton, 157 Cal. 130, 107 Pac. 301, 137 Am. St. Rep. 118; Altoona Q. M. Co. v. Integral Q. M. Co., 114 Cal. 100, 45 Pac. 1047) and the statement of the Montana court that the "cardinal principle is that the work done upon one claim or more must inure to the benefit of all," it is possible to conceive a situation where the showing under this latter proposition would be so strong· as to bring a group of claims within the rule, irrespective of whether they are contiguous. However, we do not have to further consider this problem here.

Notwithstanding the principles announced by the court in the Rice Oil Company case, supra, the fact remains that we do not have any decision which could be cited as an authority for a positive definition of what constitutes a "mine" under this State's net proceeds tax law. Costigan, Handbook on American Mining Law, section 39, page 143, has cautioned that:

"The word 'mine' is a word to be avoided, because of its complex meaning. It is used so variously that it cannot be used safely without coupling with it each time a statement of the sense intended."

Because of the innumerable conditions and widely varying situations under which mining operations are conducted, we believe that any attempt here to set forth an absolute criterion of general opplication for determining whether a particular mining operation constitutes one or more mines would not be warranted on the record before us.

We do not believe that each shaft through which minerals are removed must be considered a separate mine (58 C.J.S. Mines and Minerals, section 1, page 16; Janosky v. Lehigh Valley Coal Co., 241 Pa. 190, 88 A. 419). The considerations of paramount importance in determining whether a particular operation constitutes one mine, as distinguished from more than one, are ownership, location, integration of mining system, and single management.

As applied to the instant case, these considerations all point

to one mining operation for the purpose of net-proceeds taxation.

- The only statutory definition of the word mine we find is in the Coal Mining Code, R.C.M. 1947, section 50-530, reading as follows:

"In this act the words 'mine' and 'coal mine,' used in their general sense, are intended to signify any and all under-ground parts of the property of a mining plant which contribute, directly or indirectly, under one management, to the mining or handling of coal."

This legislative definition is in line with our conclusions in the instant case.

The judgment of the district court is affirmed.

MR. CHIEF JUSTICE HARRISON, and MR. JUSTICE ANGSTMAN, concur.

MR. JUSTICE BOTTOMLY: I dissent.