NORTHERN PACIFIC RY. CO., Appellant, *v.* COUNTY OF MUSSELSHELL et al., Respondents.

(No. 4,029.)

(Submitted June 4, 1917. Decided July 9, 1917.)

[169 Pac. 53.]

*Taxation—Mines and Mining Claims—Constitution—Estates in Land—Northern Pacific Land Grant—Deeds—Reservations— Coal in Place—Surface Rights—Ascertainment of Taxable Value—Injunction.*

Taxation—Constitution—"Mine"—What Constitutes.

    1. *Held,* that the expression "all mines" in the last clause of section 3, Article XII, of the state Constitution, providing that among other things the net proceeds thereof shall be taxed, was intended to apply to all mineral deposits—both those found in lands purchased from the United States under the mining laws, and those obtained by grant or purchase under other laws.

Same—Deeds—Reservations—Coal in Place—Not Taxable.

    2. Coal in place, found in lands granted by the government to the Northern Pacific Railway Company, which coal the company reserved

to itself in deeds to portions thereof sold by it, constitutes a mine, and as such, in its undeveloped condition, is not a proper subject for taxation. (See, also, Opinion on Motion for Rehearing, at [6].)

Same—Reservations—Surface Rights Taxable.

3. The right, also reserved in deeds referred to above, to such use of the surface of the land as may be necessary for the exploration, mining and carrying away of the coal that may be found below, is a valuable interest in the land itself, and as such properly subject to taxation.

Same—Surface Rights—Taxable Value—How Ascertained.

4. The taxable value of the right to the use of the surface of the land for the purposes referred to in paragraph 3, *supra*, omitting the deposit from the estimate, is to be ascertained the same as if the entire estate, *i. e.*, the land and the reservations, was vested in the grantee, the assessor to make an equitable apportionment of this value between the grantee and the railway company.

Same—Tax Deeds—Injunction—When Proper Remedy.

5. Where a portion of an assessment, made in a lump sum to plaintiff railway company, was legal and a portion illegal, and the company was unable to ascertain and pay that which was legal, the remedy by injunction to restrain the threatened issuance of a tax deed was available to it.

[As to injunction against sale of property for illegal taxes, see notes in 69 Am. Dec. 198; 49 Am. Rep. 287; 23 Am. Rep. 622; 53 Am. Rep. 110.]

Same—Mines and Mining Claims—Taxable Values.

7. The purchase price of mines or mining claims acquired from the United States is the standard of value for taxation purposes (aside from the annual net proceeds, value of machinery and improvements), unless the surface is used and has a value for other purposes, in which event the latter is the taxable value; if not purchased from the United States, the taxable value is the value of the surface considered as real estate, without reference to mineral content below the surface.

*Appeal from District Court of Musselshell County; Chas. L. Crum, Judge.*

ACTION by the Northern Pacific Railway Company against the County of Musselshell and the treasurer thereof to restrain the issuance of a tax deed. From a judgment entered after sustaining defendants' demurrer to the complaint, plaintiff appeals. Reversed and remanded.

*Messrs. C. W. Bunn, Chas. Donnelly* and *Gunn & Rasch*, for Appellant, submitted a brief; *Mr. M. S. Gunn* argued the cause orally.

According to the decision in *Northern Pac. Ry. Co.* v. *Mjelde*, 48 Mont. 287, 137 Pac. 386, a body of coal developed to the extent of producing, or of being capable of producing, is a mine

without reference to the law pursuant to which title to the land in which the coal is contained was acquired from the United States. If, then, the coal in question in this case should be developed into a mine, it could not be taxed while in place in the ground. It follows that the question for consideration and decision is whether such coal before it is developed and exposed, and thereby transformed into a mine, is a proper subject of taxation. To hold that because the coal in question has not been developed it is subject to taxation would be to establish an unreasonable rule of taxation. Such a holding would authorize the taxation of undeveloped coal and mineral when such coal and mineral would not be subject to taxation after being developed. The result of such a rule would be the taxation of property of unknown value and of which no use can be made, while the same property would be free from taxation when developed, its value ascertained and it is placed in a condition for use. · If, as we contend, the coal and right to mine the same are not subject to taxation, or if either the coal or the right to mine cannot be taxed, the assessment was unauthorized and is illegal, and the injunction should have been granted. (*Barnard Realty Co.* v. *City of Butte,* 50 Mont. 159, 145 Pac. 946.)

Thus far we have assumed that the *Mjelde Case* does not decide that undeveloped coal may be taxed. If, however, we are mistaken in this assumption, we earnestly insist that the decision is erroneous and should be overruled, for the reasons already assigned, and for the further reason that it makes·a classification of coal for revenue purposes, which is unreasonable and wholly unwarranted.

According to the decision in the *Mjelde Case,* coal in land acquired from the United States pursuant to the coal land laws is not taxable, although not developed. If, then, undeveloped coal in land granted to the Northern Pacific Railroad Company, or other lands, title to which was acquired otherwise than pursuant to the coal land laws of the United States, is subject to taxation, there is clearly a classification solely with reference to the law pursuant to which title was acquired. Such a classi-

fication is wholly arbitrary and is not based upon any difference between the subjects thus classified. Furthermore, such a classification is violative of section 11 of Article XII of the Constitution, which declares that taxes "shall be uniform upon the same class of subjects within the territorial limits of the authority levying the taxes." (*Gulf, C. & S. F. Ry. Co.* v. *Ellis*, 165 U. S. 150, 41 L. Ed. 666, 17 Sup. Ct. Rep. 255; 1 Cooley on Taxation, 3d ed., 72 *et seq.; Southern Ry. Co.* v. *Greene*, 216 U. S. 400, 54 L. Ed. 536, 30 Sup. Ct. Rep. 287; *Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 540, 46 L. Ed. 679, 22 Sup. Ct. Rep. 431; *Cunningham* v. *Northwestern Imp. Co.*, 44 Mont. 180–211, 119 Pac. 554, 1 N. C. C. A. 720; *Essex County Park Com.* v. *Town of Orange*, 77 N. J. L. 575, 73 Atl. 511; *State* v. *Cudahy Packing Co.*, 33 Mont. 179, 114 Am. St. Rep. 804, 8 Ann. Cas. 717, 82 Pac. 833; *State* v. *Hoyt*, 71 Vt. 59, 42 Atl. 973; *State* v. *Richards*, 52 N. J. L. 156, 18 Atl. 582.)

*Mr. S. C. Ford*, Attorney General, and *Mr. Frank Woody*, Assistant Attorney General, for Respondents, submitted a brief; *Mr. Woody* argued the cause orally.

An owner's reservation of the minerals in land and the right to the use of surface ground for mining and removing such minerals constitutes property subject to taxation. (Constitution, Art. XII, secs. 16, 17; Rev. Codes, secs. 2498, 2501; *Murray* v. *Hinds*, 30 Mont. 466, 76 Pac. 1039; *Northern Pac. Ry. Co.* v. *Mjelde*, 48 Mont. 287, 137 Pac. 386; *Anaconda Copper Min. Co.* v. *Ravalli Co.*, 52 Mont. 422, 158 Pac. 682.)

Section 2502 of the Revised Codes requires all property to be assessed at full cash value, while the fifth subdivision of section 2501 defines the terms "value" and "full cash value," but nowhere in the Codes is any mode provided for determining or ascertaining the value of property for assessment purposes. In the absence of an express provision as to the mode of ascertaining the valuation of property for taxation purposes, the assessor must exercise his own judgment in determining the valuation of property for such purposes. (*King* v. *Gwynn*, 14

Fla. 32; *St. Louis V. & T. H. R. Co.* v. *Surrell,* 88 Ill. 535; *State* v. *Sterling,* 20 Md. 502; 37 Cyc. 1009, 1010, and cases cited in note.)

Evidently the appellant is seeking by this action to have this court hold that even though appellant has reserved the coal in this land and the right to mine and extract the same, because it is unexplored and undeveloped, the reservation has no value, and is therefore not taxable. This question is completely answered in the case of *In re Major* (*Major* v. *Pavey*), 134 Ill. 19, 24 N. E. 973.

In practically every state where the question has been before the courts, it has been held that a mineral reservation is an interest in real estate, and in many of these states the courts have also held that the coal or mineral itself may be assessed and taxed. (*Board of Commrs.* v. *Lattas Creek Coal Co.,* 179 Ind. 212, 100 N. E. 561; *Riggs* v. *Board of Commrs.,* 181 Ind. 172, 103 N. E. 1075; *Sanderson* v. *City of Scranton,* 105 Pa. St. 469; *Wolfe County* v. *Beckett,* 127 Ky. 252, 17 L. R. A. (n. s.) 688, 105 S. W. 447; *Harvey C. & C. Co.* v. *Dillon,* 59 W. Va. 605, 6 L. R. A. (n. s.) 628, 53 S. E. 928, 941; *Cherokee & P. Coal etc. Co.* v. *Board of Commrs.,* 71 Kan. 276, 80 Pac. 601; *Consolidated Coal Co.* v. *Baker,* 135 Ill. 545, 12 L. R. A. 247, 26 N. E. 651; *Graciosa Oil Co.* v. *Santa Barbara County,* 155 Cal. 140, 20 L. R. A. (n. s.) 211, 99 Pac. 483; *Tiller* v. *Excelsior Coal & L. Corp.,* 110 Va. 151, 65 S. E. 507.)

Even if the assessor did assess the coal, instead of the reservation, and the taxes were levied and imposed on the coal, instead of on the reservation, the result is exactly the same as if the reservation itself had been assessed and taxed, and in the complaint it is alleged that the treasurer is threatening to execute and deliver to the county, not a deed to the coal, but a deed to the mineral reservation.

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

This is an appeal from a judgment rendered and entered after an order sustaining defendants' demurrer to the complaint

and denying plaintiff an injunction. The facts alleged as grounds for relief are these:

On August 27, 1908, the plaintiff conveyed to one Magnus Lindstrand section 35, township 8 N., range 25 E., in Musselshell county, reserving ''all coal and iron upon or in said land, and also the use of such surface ground as may be necessary for the exploring for and mining or otherwise extracting and carrying away the same.'' In the year 1913 the assessor of Musselshell county assessed the reservation so made, for the purpose of taxation, at a valuation of $18 per acre, making a total valuation of the reservation for the entire section of $11,520. The amount of tax levied for that year was $276.48. The plaintiff having failed to make payment, the reservation was sold by the treasurer and bought in for the county in January, 1914. For each of the years 1914, 1915 and 1916, the reservation was again assessed at the same valuation. Taxes were levied as in 1913, but were not paid. The land contains coal. This, however, has never been explored or developed, and, it is alleged, the quantity, quality and value of it are speculative and matters of opinion. No use of the surface of the land for the purposes stated in the reservation has ever been made by the plaintiff. It is alleged: ''That the assessor in making said assessment in the year 1913 and said other assessments took into consideration and fixed and determined the valuation of such reservation on the basis of the quantity and quality of the coal in said land and the value thereof according to his opinion, and did value and assess said coal, and said taxes for which said property was sold were imposed and levied upon said coal and other property so reserved.'' The defendant treasurer of the county threatens to make and deliver to the county a tax deed conveying to it the reservation including the coal. To prevent this action on his part, and thus the casting of a cloud upon plaintiff's title, this action was brought.

The theory upon which the action proceeds is that the tax is wholly illegal, and hence that under the decision in *Barnard Realty Co.* v. *City of Butte,* 50 Mont. 159, 145 Pac. 946, the

remedy by injunction is available, without allegation and proof of the fact that an unsuccessful application has been made for relief to the board of county commissioners while sitting as a board of equalization. The inquiry presented by the appeal therefore is whether the reservation in the deed which includes only coal in an undeveloped condition and not yet transformed into a mine, is a proper subject for taxation. The same inquiry was before this court in the case of *Northern Pac. Ry. Co.* v. *Mjelde,* 48 Mont. 287, 137 Pac. 386. That this is so is shown by the statement in the opinion in that case of the question to be determined as follows: "We are called upon to determine whether that which the company reserved to itself in each of these parcels of land, constitutes property which is subject to taxation." The reservation to which this reference was made included "all mineral of any nature whatsoever" as well as coal and iron; but this fact does not distinguish it from this case. Neither is it distinguishable from this case by the fact that there were therein considered two reservations, one of which was in land assumed to contain coal, whereas it was not known what the contents of the other were. It was then definitely determined that such a reservation is an interest in real estate, and is subject to taxation. It was also determined that the reservation is not a mine nor a mining claim, within the language employed in section 3 of Article XII of the Constitution. It was held further that the expression "mining claim," as used therein, means a tract of land to which the right of possession or title has been acquired under the laws of Congress providing for the sale of mineral lands as such, including coal lands, and that the term "mine" means a mining property so developed as to yield, or to be capable of yielding, a profit. The term "mine" was thus construed as broad enough to include within its scope and meaning any developed and producing body of ore, without reference to how the title to the land in which it is found has been acquired. The language employed in this connection is the following: "The character of legislation, under which title or right of possession is acquired, is not a controlling factor at

all. A mine upon a patented homestead is not less a mine because title from the government was acquired under laws providing for the disposition of agricultural lands only; and an undeveloped body of ore is not a mine, though title to it was secured under the mineral laws, but it is merely a part of the real estate itself. In providing a fundamental law for the new state, the framers of our Constitution spoke in comprehensive terms; but we decline to believe that they used the word 'mine' in section 3 in a sense which would include hidden, unknown, or undeveloped deposits of ore or coal. In that section they spoke with reference to revenue and referred to something which would or might produce revenue in its present state of development." If this is accepted as the correct meaning of the term, all mines as distinguished from mining claims, wherever they are found, if developed, are put in the same class for the purpose of taxation. Nevertheless we held, not directly but impliedly, that, until developed, ore bodies underlying land obtained from the federal government by grant or conveyance under other than the laws relating to the disposition of mineral lands, are an element of value of the land, and are to be taxed as a part of it. The final conclusion was stated as follows: "In the absence of any allegation bringing either of these rights [the two reservations under consideration] within the definition of a mine, or disclosing that they are, or either of them is, valueless, the complaint fails to state a cause of action. If this conclusion in its ultimate analysis involves a classification of property, which will result in denying to any person within this jurisdiction the equal protection of the laws—and we do not think that it does—the responsibility must rest upon the framers of our Constitution, who, in their zeal to promote the mining industry, arbitrarily gave to mines and mining claims a status before the law not enjoyed by other species of property."

That decision is conclusive of this case, if based upon a correct conception of the purpose had in view by the constitutional convention. Upon a more mature consideration of the subject, however, aided by the light shed upon it by a study of the de-

bates which occurred at the time of the formulation of the Article relating to revenue (Article XII), we are convinced that our conclusion is not entirely in accord with the aim of the convention. As expressive of the purpose that all property should bear its just proportion of the burden of supporting and maintaining the government, the convention adopted section 1. Under this it became the duty of the legislature to provide for a uniform rate of assessment and taxation, upon a just valuation of all property, except as otherwise provided in other sections of the Article. By section 16 it was made the duty of the legislature to provide generally the manner of assessment, except as otherwise provided, there being added a specific provision as to who should assess railroad property. In section 17 the convention defined the meaning of the term "property." In section 2 it provided for exemptions, enumerating what property was to be absolutely exempt, and what the legislature might in its discretion exempt. The purpose of section 3 was to provide a special method for the assessment and taxation of mining property. The making of the special provision on the subject shows conclusively that the convention was of the opinion that this species of property, though falling generally within the definition of "property" as made in section 17, could not be justly dealt with by the method provided for other real property, and therefore must be valued and taxed by a method which would accomplish this desired result. The theory adopted was that it should be regarded as of a mixed quality—real as to the surface value, and personal as to the subsurface contents of it. This is apparent from a reading of it: "All mines and mining claims, both placer and rock in place, containing or bearing gold, silver, copper, lead, coal, or other valuable mineral deposits, after purchase thereof from the United States, shall be taxed at the price paid the United States therefor, unless the surface ground, or some part thereof, of such mine or claim, is used for other than mining purposes, and has a separate and independent value for such other purposes, in which case said surface ground, or any part thereof, so used for other than mining purposes, shall be

taxed at its value for such other purpose, as provided by law; and all machinery used in mining, and all property and surface improvements upon or appurtenant to mines and mining claims which have a value separate and independent of such mines or mining claims, and the annual net proceeds of all mines and mining claims shall be taxed as provided by law.'' In order that no value should escape from taxation, the surface value was arbitrarily fixed at the price paid for it to the government; the convention presuming, of course, that ordinarily mining property would have no value for any purpose other than for mining. In other words, in their estimation it would have no value except, when it would be in condition to produce profit. That such other value as it might derive from its use for residential, manufacturing and agricultural purposes, it was determined must be ascertained as if it were real estate, and added to the purchase price. The machinery and other improvements put upon the surface and having an independent value, it was determined should be valued as improvements upon other property. To this extent the valuation and assessment were to be ascertained under the provisions of law applicable to other real property. As to the subsurface contents, the theory was adopted that they should be regarded as having no taxable value other than so far as they might add to the resources of the owner by the yielding of a profit. Hence the last clause was added which in effect made an exemption of the contents from taxation so long as they should not prove a source of profit by being extracted and converted into personal property. This theory necessitated the devising of a method of ascertaining the net profits, and a mode by which their taxable value might be ascertained, a levy thereon made and the collection of it enforced, at a rate uniform with that laid upon all personal property. That the convention determined that such property, when not a source of profit to the owner of the surface, should not be subject to taxation is made clear as well by the previous legislation on the subject as by the special scheme devised in section 3. (*Northern Pac. Ry. Co.* v. *Mjelde, supra*.) In announcing our conclu-

sion in his case we were of the opinion that in adopting section 3, the convention intended to be understood as confining its application exclusively to mines purchased from the United States. If, however, the definition of the term "mine," as adopted in the *Mjelde Case,* is correct—and we think it is—it is broad enough to include mines wherever found.

The debates had in the convention are not easily accessible because they have not yet been published. Previous to the adoption of section 3, however, there was much diversity of opinion among the members. Some of them advocated the elimination of any special provision on the subject of mines and mining claims; these entertaining the opinion that mineral deposits should be taken into the estimate as an element of value, whether they had been developed or not. The adoption of this plan would have put all lands into the same class. Others, and by far the larger number, advocated the adoption of section 3, upon the theory that however rich a deposit might apparently be or was supposed to be, the real value was at best a matter of speculation; that it was varying and uncertain; that it might be of great apparent value to-day and by to-morrow of no apparent value—this because of changed conditions found in the earth in the process of development, and because in its undeveloped state no intelligent estimate of its value could be made by the assessing officer. While the discussion had special reference to land acquired under the laws relating to mineral lands, it disclosed a purpose to devise a method by which all property could be made to bear its just burden under an ascertainable value, as well as a definite purpose to avoid leaving the ascertainment of the value of any of it to speculation which would vary in result as widely as the individual opinions or judgments of different assessors, and thus result in valuations in no sense uniform as to that particular class of property. The language of the section is not expressed in the most apt and appropriate terms; but we are of the opinion that the expression "all mines," as used in the last clause of it, was intended to apply to all mineral deposits, and to put them in the category of personal property; the margin

over and above the cost of extraction only to be taxed at a value to be ascertained by visual inspection or mathematical calculation. In any event, it is broad enough to include all, both those found in lands purchased from the United States under the mining laws, and those obtained by grant or purchase under other laws. Indeed, there is no reason to suppose the convention, in devising a method for the taxation of mineral deposits, gave careful attention exclusively to mines and mining claims purchased as such, omitting all consideration of those acquired by other modes, though many members must have had knowledge of the existence or possible discovery of the latter. We must conclude that the members were fully informed that the grant of lands now held by the plaintiff included coal and iron. We must conclude, also, that they knew that lands acquired by settlers under the homestead and other laws relating to the disposition of agricultural lands were possibly underlaid with mineral deposits. Presuming that they had this knowledge, it would be doing violence to their intelligence to conclude that they arbitrarily and without reason left such deposits to be valued and taxed according to the varying opinions of different assessors, without considering whether they could be made a source of actual profit. It is more reasonable to suppose that by the use of the general language employed in the last clause, they intended to include all mineral deposits, and to declare that their taxable value should be their productive value after development. It is more reasonable also to conclude that they intended to classify mines as such, rather than that they intended to classify them with reference to the law by which title was acquired, and thus leave themselves open to the imputation that they made an arbitrary classification. This would necessarily have been the result, for it would follow that coal lands acquired under the law providing for their disposition as such would be taxable under section 3, *supra,* whereas a homestead adjoining would be taxed upon its undeveloped coal as an element of value.

So far as these views are in conflict with the final conclusion announced in the *Mjelde Case,* the latter is to be considered as

overruled. It does not follow, however, that the reservation in [3] controversy is without any taxable value. The right reserved to the use of the surface is of substantial value and may be availed of at any time. It includes so much of the surface as may be necessary to explore, develop and extract either coal or iron; the extent or duration of the use being limited only by the extent of the deposit. This necessarily detracts from the value of the land to the plaintiff's grantee, and to this extent it is an interest in the land itself, and is properly the subject of taxation. (Const., Art. XII, sec. 17; Rev. Codes, secs. 2498, 2501.)

This brings us to the question: How is its value to be ascertained? [4] tained? The only answer is that the cash value of the land, omitting the deposit from the estimate, is to be ascertained as if the entire estate or land as vested in the grantee, and an equitable apportionment of this value made by the assessor between the grantee and the plaintiff.

It is contended by the Attorney General that though the coal [5] deposit was improperly included by the assessor as the principal element in ascertaining the value of the reservation, inasmuch as the surface right was taken into consideration also, the assessment was valid in part, and hence that the complaint does not state a case for relief by injunction, because it is not alleged therein that the plaintiff applied to the board of county commissioners while sitting as a board of equalization for relief from the illegal portion of it. To support this contention he cites and relies upon the case of *Danforth* v. *Livingston,* 23 Mont. 558, 59 Pac. 916. In that case complaint was made of an overvaluation, and it was properly held that in such a case relief by injunction would not be granted, unless the overvaluation was the result of arbitrary action or fraud by the assessor, and the board had refused relief. That case is not in point here. The question presented here is whether an injunction will be granted to restrain the issuance of a deed to the purchaser at a tax sale, when the tax to enforce the collection of which the sale was made was in part illegal. Where such a tax is wholly illegal, the sale may

be enjoined.    (*Barnard Realty Co.* v. *City of Butte, supra.*)
The conclusion reached in that case was held permissible under
section 2741 of the Revised Codes, which, though prohibiting
generally the issuance of an injunction to restrain the collection
of a tax, nevertheless permits the issuance (1) when the tax is
wholly or in part illegal or unauthorized by law, and (2) when
the property is exempt.    In the first case, if any part of the tax
is illegal, it must appear that this part has been paid.    This
presumes, of course, that the legal and illegal portions are sepa-
rable and the legal part is ascertainable.    Here the case is pre-
sented of a gross sum, the legal part of which cannot be ascer-
tained and paid.    Clearly the plaintiff ought to have paid the
part of it due upon the surface right, but since it could not
ascertain what amount was apportioned to this part of the res-
ervation, it could not comply with the statute.

We know of no case in which the same question has been exam-
ined and determined.    We think, however, that under the anoma-
lous situation in which the plaintiff finds itself, it ought not to
be denied the relief demanded.    Hence we conclude that the
district court erred in sustaining the demurrer, and that the
judgment should be reversed.

It is proper to say of the *Mjelde Case* that in determining it
this court did so on the theory that undeveloped coal deposits
ought to be considered an element in ascertaining the value of
the land in which they are found, and that the levy had been
properly made.    It is also proper to say that in view of the con-
clusion announced therein, the district judge was fully justified
in sustaining the demurrer and denying the injunction.

MR. JUSTICE HOLLOWAY concurs.

MR. JUSTICE SANNER concurs in the result.

ON MOTION FOR REHEARING.

(Submitted October 2, 1917.   Decided December 12, 1917.)

MR. JUSTICE SANNER delivered the opinion of the court.

The motion for rehearing in this case proceeds upon the assumptions that this court by its opinion has overruled *Northern Pacific Ry. Co.* v. *Mjelde,* 48 Mont. 287, 137 Pac. 386, and has in effect decided that reservations such as the one here involved are not taxable.   The briefest glance at the opinion will suffice to dispel the latter assumption, while the former is equally groundless, as we shall endeavor to show.

In the *Mjelde Case* two sections of land conveyed to different grantees were involved; one supposed to contain coal, whereas the presence of coal in the other was unknown.   The question before the court was ''whether that which the company reserved to itself in each of these parcels of land constitutes property which is subject to taxation under the Constitution and laws of this state.''   The company claimed immunity on the ground that the subject of the reservations—coal in place—is a mine within the meaning of section 3, Article XII, of the state Constitution, taxable as such only when there are net proceeds.   Manifestly this did not, and could not, meet the issue, because it ignored the interest in real estate, regardless of coal-content, asserted by the reservations.   We held them to be taxable as an interest in real estate, saying, *arguendo,* that a mining claim is a tract of land to which title and right of possession has been acquired under the mineral or coal land laws of the United States; that a mine, in the revenue sense as employed in section 3, ''is a mineral deposit, whether metallic or nonmetallic, developed to the point of production and actually yielding, or capable of yielding, proceeds''; that the character of legislation under which title has been acquired has nothing to do with the existence or nonexistence of a mine; and that coal in place and undeveloped is not a mine.   These reflections lead to an interesting situation which may be exemplified as follows: Smith owns a tract acquired under

the homestead laws, and the assessor thinks it contains valuable deposits of coal; it is not a mining claim, because not acquired under the mineral or coal land laws; it is not a mine, because the deposit has not been developed to the point of production. The assessor, however, rates it not only upon the surface value for agriculture, but additionally upon the supposed value of the coal deposit; Smith is compelled to pay accordingly, but, driven by the exactions, opens up the deposit, brings it to the point of production, makes it capable of yielding proceeds, which proceeds, however, are inadequate to pay the cost of operation; it is then a mine, but not taxable, because there are no net proceeds. Can it be that such a result was within the contemplation of section 3, Article XII? That a burden may be imposed upon Smith in consequence of pure speculation, only to be relieved when, at a further burden, he has shown its utter futility? In the revenue sense it is doubtless true that a mine is a deposit of coal or mineral developed to the point of yielding net proceeds; but it is no less a mine because development has not reached or has passed that point. The very use of the term "mine" in collocation with the phrase "net proceeds" implies that there may be, as there are, mines with net proceeds, mines without net proceeds, mines with no proceeds at all; and the last are familiar spectacles on many hillsides. In point of fact, the discussion of the meaning of the term "mines" was not essential to the conclusion reached in the *Mjelde Case,* for several reasons, among them this: There was nothing to show that the assessment had been based, in whole or in part, upon assumed coal or mineral content—a fact which forms the very foundation of the present controversy. We took occasion to point out, however—and these are the true data of the decision—that the provisions of Article XII of the Constitution, including section 3, are designed to aid, not to prevent, the raising of public revenue; that the reservations constitute property with a value, taxable because not exempt, and that the difficulty which might confront the assessor in ascertaining the value is no bar to such taxation. From these postulates there is no recession in the

[6]  instant case, notwithstanding it is now held that the coal reserved constitutes a mine subject to taxation as such.

That we are justified in the position taken, if not in all the language employed, will, we think, be granted by whoever may consider the premises.  The reservation in question is dual: A corporeal hereditament, as to the coal and iron; an incorporeal hereditament, as to the right to enter the lands conveyed, to explore for coal or iron, and to extract the same when found, using so much of the surface as may be necessary.  In the nature of things, the latter could not be a mine, but it is property, presumably valuable, not exempt, and therefore taxable as an interest in realty; and the difficulty which may confront the assessor in ascertaining the value can be no bar to such taxation.  With the former, however—the corporeal hereditament —the situation is somewhat different.  It, too, is property; but it consists, by the hypothesis, of coal or iron in place; coal or iron in place may be a mine in a proper sense of that term (*Colorado Coal & Iron Co.* v. *United States*, 123 U. S. 307, 327, 328, 31 L. Ed. 182, 8 Sup. Ct. Rep. 131; *Davis* v. *Weibbold*, 139 U. S. 507, 518, 35 L. Ed. 238, 11 Sup. Ct. Rep. 628; 1 Lindley on Mines, 3d ed., 136), and we are convinced that it is such within the meaning of the word as used in section 3 of Article XII.

Distinguished counsel for respondents asserts that the conclusion reached in the opinion ignores or annuls the important phrases, ''after purchase thereof from the United States,'' and ''at the price paid the United States therefor.''  Quite the contrary is true.  We considered these phrases most carefully, and we give to them the place and meaning which their words and context demand.  They have to do with mines and mining claims acquired under the mineral or coal land laws of the United States, and are designed to furnish a basis for taxing the surface only of such lands in the event—frequent, as a matter of fact—that the surface may have no other value.  To give them a different application, to say they restrict the net proceeds basis to mines so acquired, would compel the lack of

uniformity and the unreasonable classification mentioned by the Chief Justice. Under section 3, Article XII, all mines and [7] mining claims are to be taxed; this because they are property, and all property not exempt is subject to taxation. They are to be taxed upon their annual net proceeds without regard to the source of title or to whether the operator has title; if there are no net proceeds, either because development has not progressed so far or for any other reason, then, for the time being, this basis of taxation is in abeyance. They are also to be taxed upon the value of the machinery and improvements used in connection with them, if there are any. Finally they are to be taxed upon their surface (a) if bought from the United States, at the price paid therefor, unless (b) such surface is used and has a value for other than mining purposes, in which event they are taxable at such value; or (c) if not bought from the United States, then at the value of such surface considered as real estate, without reference to mineral content below the surface.

It follows, too, that the taxable value of the incorporeal part of the reservation is to be deducted from the whole value of the surface; or, as stated in the opinion, "from the cash value of the land, omitting the deposit from the estimate," because the rights reserved—apart from the deposit—all relate to the surface and limit the owner's dominion over the surface.

It is said in the opinion that such value as the surface of a mine or mining claim purchased from the United States may have for other than mining purposes must be added to the purchase price and taxed accordingly. This was an inadvertence. Our view, as stated above, is that the purchase price in such cases is the standard of value, unless the surface is used and has a value for other purposes, in which event the latter is the taxable value.

With the clarification suggested above, we feel constrained to adhere to the decision.

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.