THE HON. HENRY L. MYERS,
THE HON. ALBERT P. STARK,
THE HON. JOHN A. MATTHEWS, } Associate Justices.
THE HON. ALBERT J. GALEN,

HINZ, RESPONDENT, v. MUSSELSHELL COUNTY ET AL., APPELLANTS.

(No. 6,313.)

(Submitted May 3, 1928.   Decided June 8, 1928.)

[267 Pac. 1113.]

*Taxation of Lands Containing Mineral—Constitutional Law—Sale of Lands—Reservations—Interests in Realty Taxable—Tax Deeds—Improper Notice to Owner or Occupant—Injunction.*

Constitution—Rule of Construction.
   1.   The state Constitution must be construed in the light of the history of the state, the subject matter under consideration, the surrounding circumstances, the object sought to be attained and the system of laws in force in the territory at the time of its adoption.

1.   See 5 Cal. Jur. 592; 6 R. C. L. 50.

(502)

Taxation of Mines—When Surface Taxable as Separate Estate.

2. Under section 3 of Article XII of the state Constitution, mines containing, *inter alia*, coal, must be taxed at the price paid the United States per acre therefor, but where the surface ground has acquired a value for some other use than for mining and is used for such purpose, a new estate is created independent of the original estate which is taxable as such. (Language at the close of opinion on rehearing in *Northern Pac. Ry. Co.* v. *Musselshell County,* 54 Mont., on page 113, intimating the contrary disapproved.)

Same—Minerals in Mine not Taxable *in Situ.*

3. Under the section of the Constitution above, the minerals contained in a mine or mining claim cannot be taxed *in situ,* only the net proceeds from the minerals after extraction being taxable.

Same—Sale—Reserved Mineral Rights not Taxable—Reserved Right to Enter upon Land for Purpose of Exploration is Interest in Realty and Taxable.

4. Where the owner of land underlaid with coal sold it reserving to himself the minerals therein and also the right to use the surface for mining purposes with a right to purchase such reserved portions at their market value, an attempted assessment of the mineral rights was in effect an assessment of the mineral deposit, the coal, *in situ,* and therefore illegal under the last above rule; but the reserved right to enter upon the land for the purpose of exploring for and extracting the minerals therein, being an interest in realty, was taxable, the value of such right, however, being deductible from the taxable value of the land— the price paid the United States therefor by the patentee.

Same—Assessing Taxable and Nontaxable Reserved Rights Together Renders Tax Void.

5. Where nonassessable mineral rights, or mineral deposits *in situ,* were assessed together with properly assessable reservations of surface rights, thus rendering the legal and illegal items inseparable, the whole tax was void.

Real Property — Tax Sale — Application for Tax Deed — Notice to Owner or Occupant—Statute—Provision Applicable Where County is Purchaser.

6. The provision of section 2209, Revised Codes, that the purchaser of real property at delinquent tax sale shall, thirty days prior to application for tax deed, serve written notice on the owner or occupant thereof stating, among other things, the amount of taxes due thereon, is as applicable to where a county was the purchaser as to where an individual bought it in.

Same—Tax Sale—Application for Tax Deed—Notice Stating Incorrectly Amount of Taxes Due Invalid—Injunction to Prevent Issuance of Tax Deed Proper.

7. The purpose of notice required by section 2209, supra, to be given by the purchaser of real property on delinquent tax sale prior to application for tax deed is, *inter alia,* to advise the owner thereof of the amount he must pay in case he desires to redeem

---

3. Taxation of interest in minerals separately from land, see note in 15 **Ann. Cas.** 513. Interest of one other than owner of soil in mineral *in situ* as independent subject of taxation, see notes in 17 **L. R. A.** (n. s.) 688; **L. R. A.** 1916D, 307. See, also, 18 **R. C. L.** 1264.

5. See 24 **Cal. Jur.** 165.

6. See 24 **Cal. Jur.** 362.

7. See 24 **Cal. Jur.** 324.

and therefore the amount must be stated correctly; hence, where a county in its notice to an owner included in the total amount of taxes due those unlawfully levied for three years, the notice stated the amount due incorrectly and the court properly enjoined the county treasurer from issuing a tax deed to the purchaser.

Same—Issuance of Tax Deed—Injunction—Improper Notice—Application to County Board of Equalization not Prerequisite to Granting of Relief.

8. Where a tax sale of land bought in by a county was void for failure to include in the notice required to be given by section 2309, Revised Codes 1921, to the owner of the purchaser's intention to apply for a tax deed, the correct amount due, application for relief to the county board of equalization was not a prerequisite to the institution of injunction proceedings to prevent the county treasurer from issuing a deed to the county.

---

[1, 2]   Constitutional Law, 12 C. J., p. 701, n. 75, p. 710, n. 59, 61, p. 711, n. 63.   Mines and Minerals, 40 C. J., p. 871, n. 42.   Taxation, 37 Cyc., p. 775, n. 63, p. 776, n. 72.
[3]   Taxation, 37 Cyc., p. 1011, n. 43.
[4]   Taxation, 37 Cyc., p. 775, n. 64.
[6]   Taxation, 37 Cyc., p. 1425, n. 14.
[7, 8]   Taxation, 37 Cyc., p. 1281, n. 24.

*Appeal from District Court, Musselshell County, in the Fifteenth Judicial District; O. F. Goddard, a Judge of the Thirteenth District, presiding.*

Suit by Louis L. Hinz against Musselshell County and another. From a judgment for plaintiff, defendants appeal. Affirmed.

*Mr. L. A. Foot,* Attorney General, *Mr. A. H. Angstman,* Assistant Attorney General, and *Mr. A. G. McNaught,* County Attorney of Musselshell County, for Appellants, submitted a brief; *Mr. Angstman* and *Mr. McNaught* argued the cause orally.

*Mr. W. W. Mercer* and *Messrs. Johnston, Coleman & Johnston,* for Respondent, submitted a brief; *Mr. H. J. Coleman* argued the cause orally.

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

The plaintiff brought this action to restrain the defendant county treasurer from issuing a tax deed conveying to Mussel-

shell county the lands involved in this suit. The parties agreed upon the facts and the case was thereupon submitted to the district court which rendered judgment for the plaintiff. Hence this appeal.

The facts are that prior to 1921 a predecessor in interest of the plaintiff purchased two tracts of land pursuant to the laws of the United States providing for the acquisition of coal lands, at the price of twenty dollars per acre. On October 24, 1924, plaintiff's predecessor sold to one Porter the surface of the lands reserving the minerals therein, including coal, iron, natural gas and oil, "together with the use of the surface as may be necessary for exploring for and mining or otherwise extracting and carrying away the same." It was provided that "the grantor, heirs, successors and assigns, at the time mining operations are commenced shall pay the market value of such portion of the surface as may be used for such operations." Plaintiff purchased these reserved rights in the lands—the minerals and privileges above described—upon December 24, 1924.

It is presumed that the lands are underlaid with coal, but there has not been any exploration or development to verify the presumption.

It is stipulated that the surface of the lands has never been used for mining purposes but always has been used for other than mining purposes, and has had a separate and independent value for such other purposes, the surface value at all times having been less than twenty dollars per acre. Also that in the years 1921, 1922, 1923 and 1924 the assessor of Musselshell county assessed the lands at a value of twenty dollars per acre because that was the price paid to the United States therefor; and that in making the assessment no attempt was made by him to segregate the value of the surface of the lands from the value of the coal supposed to lie thereunder. In the years 1925, 1926 and 1927 the assessor assessed the mineral rights and reservations of the lands at a value of twenty dollars per acre; in the years 1926 and 1927 he as-

sessed the surface of the lands for taxation at a value considerably less than twenty dollars per acre. No part of the taxes levied for the years 1921 to 1927, inclusive, has been paid. The lands were sold on January 20, 1922, for the nonpayment of the 1921 taxes. The county clerk of Musselshell county gave notice that on November 15, 1927, Musselshell county would apply to the county treasurer for a tax deed to the property. Two notices were given, one relating to each tract of land. As to one, the notice stated that the land described had been sold for taxes on January 20, 1922, to Musselshell county, that the amount for which the property was sold at tax sale was the sum of $213, and "that the amount now due including subsequent taxes, interest and costs is $1,262.45." As to the other the notice stated that the land described had been sold for taxes at tax sale on January 20, 1922, to Musselshell county, that the amount for which the land was sold was $425.51, and "that the amount now due including subsequent taxes, interest and costs is $2,521.20."

It is conceded that the defendant county treasurer threatens to and if not enjoined will issue a tax deed for the lands.

After considering the facts agreed upon the court concluded that it is impossible to segregate the amount of taxes, if any, legally levied upon the lands in any one of the years from 1921 to 1927, inclusive, from the taxes illegally levied thereupon for each of those years, and thereupon concluded as a matter of law that judgment should go for the plaintiff.

1. Section 3 of Article XII of our state Constitution, which [1, 2] governs this case, reads as follows: "All mines and mining claims, both placer and rock in place, containing or bearing gold, silver, copper, lead, coal or other valuable mineral deposits, after purchase thereof from the United States, shall be taxed at the price paid the United States therefor, unless the surface ground, or some part thereof, of such mine or claim, is used for other than mining purposes, and has a separate and independent value for such other purposes, in which case said surface ground, or any part thereof, so used

for other than mining purposes, shall be taxed at its value for such other purposes, as provided by law; and all machinery used in mining, and all property and surface improvements upon or appurtenant to mines and mining claims which have a value separate and independent of such mines or mining claims, and the annual net proceeds of all mines and mining claims shall be taxed as provided by law."

Our state Constitution must be construed in the light of the history of the commonwealth, the surrounding circumstances, the subject matter under consideration, the object sought to be attained, as well as the system of laws which were in force in the territory at the time of its adoption. (*State ex rel. Hillis* v. *Sullivan,* 48 Mont. 320, 137 Pac. 392; *Northern Pacific Ry. Co.* v. *Mjelde,* 48 Mont. 287, 135 Pac. 386; *State ex rel. Rankin* v. *Harrington,* 68 Mont. 1, 217 Pac. 681.)

The provisions of this section have received the consideration of this court on a number of occasions. The reasons which actuated the members of the Constitutional Convention in formulating the law have been discussed in *Northern Pacific Ry. Co.* v. *Mjelde,* supra, *Barnard Realty Co.* v. *City of Butte,* 50 Mont. 159, 145 Pac. 946, and *Northern Pacific Ry. Co.* v. *Musselshell County,* 54 Mont. 96, 169 Pac. 53. We have studied these cases and have also had the benefit of reading the debates of the Constitutional Convention, which have been transcribed and are now in book form. A large majority of the members of the convention were thoroughly familiar with the mining industry, which then consisted chiefly of quartz and placer mining. They were familiar with the legislative history of the territory with respect to the taxation of mining claims and the net proceeds of mines. (As to this see *Northern Pacific Ry. Co.* v. *Mjelde,* supra.) They knew that some of the leading cities of the state were built upon the surface of mining claims. Indeed, the business section of Helena, the capital city, in which the convention held its sessions, then stood and now stands upon the banks of Last Chance Gulch. The city of Butte then rested and now rests mainly upon the

surface of the lode mining claims which have made the Butte district the greatest mining camp of the world.

Placer mining claims generally consist of auriferous deposits occupying the beds of streams and the adjoining hillsides called by the placer miners, "bars." In *Moxon* v. *Wilkinson*, 2 Mont. 421, Judge Blake defined placers as "superficial deposits which occupy the beds of ancient rivers and valleys." (*Montana Coal & Coke Co.* v. *Livingston,* 21 Mont. 59, 52 Pac. 780.) As a rule the surface was essential to the working of placer mines. In fact, the golden sands frequently extended from the grass roots to the bedrock. In the view of quartz miners the lode was the principal thing, the surface merely an incident. (Lindley on Mines, sec. 361.)

That in framing section 3 the convention had in mind chiefly placer and lode mining claims there cannot be the slightest doubt. With respect to these it was recognized that while the surface of the ground should be deemed valuable primarily for mining purposes, yet it might be available for other purposes and have a separate and independent value as such.

When the convention was sitting coal mining in Montana was in its infancy, and the industry was of comparatively small importance. Nevertheless, the members of the convention were apprised, to some extent at least, of the tremendous coal deposits which underlie Montana's soil. There cannot be any doubt that coal was included as a mineral advisedly. (*Montana Coal & Coke Co.* v. *Livingston,* supra.) The minerals named and all other valuable mineral deposits were put in the same category for the purpose of taxation.

It was the intention of the convention to provide a system of taxation which would exact from the owners of mines and patented mining claims their equitable proportion of the expense of government. In *Barnard Realty Co.* v. *City of Butte,* supra, Mr. Chief Justice Brantly, in a well-considered and sound opinion, said the convention recognized "the fact that such property is not generally susceptible of profitable use

unless the deposits therein are extracted and put into com-
mercial form, and in order to encourage the work of profitable
development by protecting it against exactions which might
prevent this result, it was deemed that the owner of a mining
claim would fully acquit himself of his obligation to the
public by paying a tax: (1) Upon the acreage at the price
paid to the United States; (2) upon the machinery used in
mining and surface improvements, etc., upon or appurtenant
to the claim, which have a value independent thereof; and
(3) upon the net proceeds of the product.  So long as the
claim is used and held exclusively for mining purposes, the
owner of it is not required to bear any other burden; but
when the property, having by its location acquired a value
for some independent use, is devoted by the owner to such
use, it becomes at once subject to taxation at that value as is
other real estate, to be ascertained by the assessing officer
just as he ascertains the value of other land for the pur-
pose of taxation.  By devoting it to the new use the owner,
so to speak, creates an estate which, in the eye of the law,
is regarded as independent of the original estate and is sub-
ject to taxation as such.  It will be noted, however, that two
conditions must concur to justify the imposition of the ad-
ditional burden, viz.: the surface ground, or some part thereof
must be used for other than mining purposes, and it must
have an independent value for that purpose.  When these
conditions concur, but not otherwise, the owner must assume
the additional burden.''  In the *Barnard Case* the court af-
firmed the doctrine of *Murray* v. *Hinds,* 30 Mont. 466, 76
Pac. 1039, in which it appeared that the owners of the mining
claim had paid taxes due upon the mining claim as such,
but had platted the surface of the claim and were selling town
lots thereon.  In that case this court said: ''If the surface
ground of the Railroad lode which is in controversy in this
action, at the time the tax was levied, was used for other
than mining purposes, and had a separate and independent

value for such other purposes, the tax, if regularly levied, should be sustained."

The same doctrine was announced in *Northern Pacific Ry. Co.* v. *Musselshell County* in the original opinion (54 Mont. 96, 169 Pac. 53), although it seems to have been departed from in the opinion on rehearing (54 Mont. 110, 169 Pac. 57). If the language at the end of the opinion on rehearing: "Our view, as stated above, is that the purchase price in such cases is the standard of value, unless the surface is used and has a value for other purposes, in which event the latter is the taxable value," may be deemed at variance with what is said in *Murray* v. *Hinds, supra, Barnard Realty Co.* v. *City of Butte, supra,* and what is announced in this opinion, we deem it an incorrect statement of the law. Clearly the purpose of the convention was to place an arbitrary value upon patented mining claims at the price paid the United States therefor, reckoned upon the acreage therein contained. (*Northern Pacific Ry. Co.* v. *Mjelde, supra; State ex rel. Hinz* v. *Moody,* 71 Mont. 473, 230 Pac. 575.) That value is fixed and immutable.

There is much talk in the decisions of the "surface." The Constitution speaks of the use of the surface: when the surface is used for purposes other than mining and has a separate and independent value for such purposes. But the grantee of the United States, when he receives letters patent for his mining claim, owns the soil from the surface to the center of the earth within the vertical lines of his boundaries, save for such reservations as may be made in the patent, or be provided by law. The design, then, was, first, to tax the mining claim reckoned upon its acreage; in addition, to tax the surface if it came to pass that the surface, when used for purposes other than mining, had a separate and independent value for such purposes; in addition, to tax the machinery used in mining, and all property and surface improvements upon or appurtenant to mines and mining claims which have a value separate and independent of such mines and mining

claims, and, finally to tax the annual net proceeds ''of all mines and mining claims.'' Certainly it cannot be contended that the separate and independent value which the surface, not used for mining purposes, but being used for other purposes and having a value for such other purposes, shall constitute the assessable value of the mining claim rather than the value fixed by the Constitution. A process of that nature would fritter away by construction the plain language and purpose of section 3, Article XII. A familiar condition will serve for illustration: A mining company has a group of adjoining lode mining claims, let us say ten, to which it has received patent from the United States. Supposing the claims are of the full size allowed by law, the group embraces over 216 acres. The price paid the United States was five dollars per acre. The company has ceased mining. The claims, lying on the grassy slopes of the mountain, furnish pasture for sheep and the company rents them for that purpose at ten cents per acre per annum. Thus the surface ground of the mining claim has a separate and independent value for pasturing sheep and is used for that purpose. But can it be possible that the value of the claims as a sheep pasture and not the price paid the government is to be reckoned as the assessable value of the mining claims? It cannot be. It must be remembered at all times that the mineral content may not be taxed *in situ* but can be taxed only as the Constitution expressly provides: upon its net proceeds. (*Northern Pacific Ry. Co.* v. *Musselshell County*, supra; *Barnard Realty Co.* v. *City of Butte,* supra.) If it may be said that some inequalities will result under this construction of the law, we answer that that is the law and, ''if such be the fact, the responsibility must rest with the framers of our Constitution and with those who ratified it.'' (*State ex rel. Hinz* v. *Moody,* supra.)

The assessment and taxation of the land at twenty dollars per acre for the year 1921 was correct, for that was the price paid the United States therefor. The command of the Constitution

here is clear and imperative. (*State ex rel. Hinz* v. *Moody,* supra.) It appears that the separate and independent value of the surface was not assessed. The title to the mining claim —the lands acquired from the United States pursuant to its laws regulating the sale of coal lands—then vested in one person. He owned the mining claims and all that was in them. If the assessor did not impose the additional burden, surely neither the owner nor his successor in interest had any cause for complaint. One complaining that his property has not been taxed high enough would disclose something new under the sun, refuting what Solomon said. (Ecclesiastes I, 9.)

What has been said respecting the taxation for the year 1921 applies to the years 1922, 1923 and 1924. But the taxation for the years 1925, 1926 and 1927 was manifestly illegal.

When the owner sold the land he reserved the minerals [4] therein, including coal, iron, natural gas and oil; a corporeal hereditament. He also reserved the right to use the surface of the land "for exploring for and mining or otherwise extracting and carrying away the same" with a right to purchase such portions of the surface at its market value as he should use for his mining operations; an incorporeal hereditament.

The attempted assessment of the corporeal hereditament, the "mineral rights," amounted to an attempted assessment of the coal, or as it may be termed, the mineral deposit. The deposit as such cannot be taxed. The Constitution forbids. The incorporeal hereditament—the right to enter into the lands conveyed, to explore for minerals, and to extract the same where found, with the right to purchase so much of the surface as may be necessary—is subject to taxation; it is an interest in realty. This taxable value to be deducted from the taxable value of the acreage, from the cash value of the land, omitting the deposit—the mineral content—from the estimate. (*Northern Pacific Ry. Co.* v. *Musselshell County,* supra.)

In the years 1925, 1926 and 1927 the assessor assessed for
[5] taxation the mineral rights and reservations together.
This he could not do lawfully. The legal and illegal items are
inseparable and this renders the tax void. (4 Cooley on Taxa-
tion, sec. 1668.)

2. As the property was lawfully sold for taxes in January,
1922, for the reason that its owner did not pay the taxes
lawfully assessed in the year 1921, the county would have
been entitled to a deed after the expiration of three years,
upon properly following the statutory steps, in the absence of
a redemption by the owner or his successor in interest. The
law provides that if property sold for taxes is purchased by
the county it must be assessed for taxes during the succeeding
year or years as if it had not been so purchased until a deed
therefor is issued, "but it must not be exposed for sale, and the
sale thereof, under such assessment, must be adjourned until the
time of redemption under the previous sale shall have expired."
(Sec. 2231, and see 2232, Rev. Codes 1921.) Property being so
sold and subsequently assessed, "no person can be permitted
to redeem from such sale, except upon payment also of the
amount of such subsequent assessment, costs, fees and inter-
est." (Sec. 2233, Id.) A redemption of the property sold
may be made by the owner, or any party interested, within
thirty-six months from the date of the purchase, or at any
time prior to the giving of the notice and the application for a
deed. (Sec. 2201, Id.) Section 2209, Revised Codes 1921, re-
[6] quires the purchaser of property sold for delinquent
taxes, thirty days before he applies for a deed, to serve upon
the owner of the property purchased, if known, and upon
the person occupying the property, if the property is oc-
cupied, a written notice stating that the property, or a portion
thereof, has been sold for delinquent taxes, giving the date of
sale, the amount of property sold, the amount for which it was
sold, the amount due, and the time when the right of redemp-
tion will expire, or when the purchaser will apply for a deed.
"The owner of the property has the right of redemption in-

definitely until such notice has been given and the deed applied for, upon the payment of fees, percentages, penalties and costs required by law.''

The requirement to give notice applies to a county as well as to an individual. (*Harrington* v. *McLean*, 70 Mont. 51, 223 Pac. 912.)

When it is sought to divest a person of his title to property for delinquency in the payment of a tax imposed **[7, 8]** *in invitum* upon the property, the law authorizing the tax must be followed with substantial strictness. (*Hotchkiss* v. *Hansberger*, 15 Cal. App. 603, 115 Pac. 957.) It is essential that the purchaser give the notice, and it must be such notice as the statute prescribes. (*Cordano* v. *Kelsey*, 28 Cal. App. 9, 151 Pac. 391; 37 Cyc. 423.) It is prescribed that the notice shall contain, among other things, the amount due. The reason for this is, obviously, that the owner shall be apprised of the amount he must pay in order to redeem the property. As the amount due must be stated, it goes without saying that it must be stated correctly. As illustrative, it has been held that where the statute requires the amount of the tax due upon the land to be stated in the advertisement of the tax sale, a variance between the amount due and the sum named in the advertisement will be fatal to the sale. (Blackwell on Tax Titles, 5th ed., sec. 424; *Alexander* v. *Pitts*, 7 Cush. (Mass.) 503.) Where the advertisement was required to state the amount due, and gave the sum total, including state and county taxes, a part of which was illegal, the sale was held void. ''The object of requiring the treasurer to name the sum due is, to give notice to the owners of what they have to pay to redeem their land and the stating in the advertisement of a false sum is equivocal to giving no notice.'' (*Clarke* v. *Strickland*, 2 Curt. 439, Fed. Cas. No. 2864.

The rule must be that a notice which does not state the amount due correctly and therefore does not apprise the owner of the amount lawfully required of him to redeem the property is invalid. A sale based upon the taxes levied upon

the lands for either of the years 1925, 1926 and 1927 would have been invalid. A tax sale for a sum in excess of that authorized by law is void. (*Treadwell* v. *Patterson,* 51 Cal. 637; *Simmons* v. *McCarthy,* 118 Cal. 622, 50 Pac. 761.)

While the sale made in January, 1922, was lawful the county defeated its right to obtain a deed pursuant thereto by including in its notice the unlawful taxes for the years 1925, 1926 and 1927; when it included those taxes it stated "an amount" which the law did not warrant.

The remedy of injunction was available to the plaintiff without an application to the county commissioners for relief. (*Barnard Realty Co.* v. *City of Butte,* supra; *Northern Pacific Ry. Co.* v. *Musselshell County,* supra.)

The judgment is affirmed.

*Affirmed.*

ASSOCIATE JUSTICES MYERS, STARK, MATTHEWS and GALEN concur.